**United States District Court
for the Eastern District of Virginia
Alexandria Division**

| | |
|---|---|
| **Thomas Curtin, Donna Curtin**, **Suzanne A. Spikes, Kelley Pinzon, Tom Cranmer,** and **Carol D. Fox,** | |
| *Plaintiffs*, | |
| *v.* | Civ. No. _____ |
| **Virginia State Board of Elections; Robert H. Brink, John O'Bannon,** and **Jamilah D. Lecruise,** in their official capacities as Chairman, Vice-Chair, and Secretary of the Virginia State Board of Elections, respectively; and **Christopher E. Piper,** in his official capacity as Commissioner of the Virginia Department Of Elections, | **Brief in Support of Plaintiffs' Motion for Preliminary Injunction** |
| *Defendants*. | |

# Brief in Support of Plaintiffs' Motion for Preliminary Injunction

"[S]triking ... the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment . . . ." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) (holding there is no constitutional right to vote absentee). With federal candidates on the ballot, the coming Virginia primary must be conducted in the "Manner prescribed . . . by the Legislature." U.S. Const. art. I, § 4, cl. 1. The General Assembly has exercised its exclusive balancing and manner authority and decided that for *this* primary election in *this* state, restricting absentee ballots to those *currently* disabled or sick, not those who *might* become ill, is essential to prevent direct and vote-dilution disenfranchisement, thereby protecting election integrity.

Yet Defendants issued contrary guidance (the "Plan"): "Voters may choose reason '2A My disability or illness' for absentee voting in the May and June 2020 elections due to COVID-19." Va. Dep't of Elections, *Absentee Voting*, https://www.elections.virginia.gov/casting-a-ball ot/absentee-voting/ (all hyperlinks herein were last checked on May 12, 2020.). That allows all

1

voters to vote absentee without current disability or illness.

But the legislature's balancing and manner-of-election mandate (the "legislative mandate") cannot be gainsaid. The rule of law may not be ignored, even amidst diminishing COVID-19 concerns. To the extent measures need to be taken to protect public health, those may not *alter* the legislative mandate. Rather, safety measures must be taken *within* the legislative mandate by employing safety measures recommended for essential activities to in-person voting.

The evidence from recent elections shows that the sudden flood of mailed ballots that will result from the current Plan will *itself* result in numerous voters being directly disenfranchised by lost or tardy ballots, given the lack of preparation, financial resources, and staffing by the USPS and election workers to handle the flood. The legislature's determination to *not* allow no-excuse balloting for *this* primary avoided that very problem. And voters who are able to cast their ballots will suffer vote-dilution disenfranchisement because the sudden flood will result in lowered monitoring by election officials and more illegal ballots. Again, such balancing of interests was already done by the legislature, which should not and may not be second guessed.

## Factual Background

### A.  COVID-19 risk is subsiding

Amid recent COVID-19 concerns, policymakers adopted measures to protect public health, since adjusted by public-health experts and policymakers as old models predicting a high death rate and large numbers of casualties have proved inaccurate. National and state officials are now building a framework to "re-open" the country, in phases, as the concerns decrease.

Virginia implemented provisions aimed to protect the public and lower the curve. On March 12, 2020, Gov. Northam declared a state of emergency.[1] He closed schools, limited gatherings to

---

[1] Va. Exec. Order 2020-51, *available at* https://www.governor.virginia.gov/media/gover-

10 people, closed dining establishments (except for delivery and take-out), entertainment busi-

nesses, etc.[2] But he allowed "[e]ssential retail businesses" to remain open including:

> Grocery stores, pharmacies, and other retailers that sell food and beverage; products or pharmacy products, including dollar stores, and department stores with grocery or pharmacy operations; Medical, laboratory, and vision supply retailers; Electronic retailers that sell or service cell phones, computers, tablets, and other communications technology; Automotive parts, accessories, and tire retailers as well as automotive repair facilities; Home improvement, hardware, building material, and building supply retailers; Lawn and garden equipment retailers; Beer, wine, and liquor stores; Retail functions of gas stations and convenience stores; Retail located within healthcare facilities; Banks and other financial institutions with retail functions; Pet and feed stores; Printing and office supply stores; and Laundromats and dry cleaners.

*Id.* On March 30, 2020, he issued the "stay at home" but allowed travel for:

> Obtaining food, beverages, goods, or services as permitted in Executive Order 53; Seeking medical attention, essential social services, governmental services, assistance from law enforcement, or emergency services; Taking care of other individuals, animals, or visiting the home of a family member; Traveling required by court order or to facilitate child custody, visitation, or child care; Engaging in outdoor activity, including exercise, provided individuals comply with social distancing requirements; Traveling to and from one's residence, place of worship, or work; Traveling to and from an educational institution; Volunteering with organizations that provide charitable or social services; and Leaving one's residence due to a reasonable fear for health or safety, at the direction of law enforcement, or at the direction of another government agency.[3]

He encouraged "social distancing of at least six feet from any other person," which order expires

June 10. On April 23, 2020, Governor Northam postponed the election from June 9 to June 23.[4]

These protective measures have been effective. The curve is flattening, the spread is being

---

norvirginiagov/governor-of-virginia/pdf/eo/EO-51-Declaration-of-a-State-of-Emergency-Due-to
-Novel-Coronavirus-(COVID-19).pdf.

[2] Va. Exec. Order 2020-53, *available at* https://www.governor.virginia.gov/media/gover-
norvirginiagov/executive-actions/EO-53-SECOND-AMENDED-Extension-of-Temporary-Restri
ctions-Due-To-Novel-Coronavirus-(COVID-19).pdf.

[3] Va. Exec. Order 2020-55, *available at* https://www.governor.virginia.gov/media/gover-
norvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Corona
virus-(COVID-19).pdf.

[4] Va. Exec. Order 2020-56, *available at* https://www.governor.virginia.gov/media/gover-
norvirginiagov/executive-actions/EO-56-AMENDED---Postponing-June-9,-2020-Primary-Electi
on-to-June-23,-2020-Due-to-Novel-Coronavirus-(COVID-19).pdf.

controlled, testing is increasing, the calculated death rate is lowering as tests show more people had mild cases, and total deaths are lower than originally projected.[5] So states are relaxing stay-at-home orders, reopening (inter alia) retail businesses, restaurants, gyms, beaches, and salons and restarting elective medical procedures.[6] Many states not yet re-opening plan to do so in May. *Id.* Social distancing and good hygiene are the most effective ways to stop transmission of the virus.[7] Social distancing means "deliberately increasing the physical space between people to avoid spreading illness. Staying at least six feet away from other people lessens [the] chances of catching COVID-19."[8]

The same social distancing and hygiene practices that are effective to prevent spreading the virus when going out for essential services like grocery shopping are effective to prevent the spread of the virus for in-person voting. Voters may vote in-person with social distancing and other recommended safeguards (masks, hand-sanitizing, etc.) to protect themselves and others. No causal link connects in-person voting and a spike in COVID-19, as shown in the Wisconsin

---

[5] *See This is where all 50 states stand on reopening*, CNN.com, https://www.cnn.com/interactive/2020/us/states-reopen-coronavirus-trnd/*; see also Provisional Death Counts for Coronavirus Disease (COVID-19)*, Center for Disease Control and Prevention ("CDC"), https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm; *COVIDView*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html; *Coronavirus death rate may be lower than previously thought*, LiveScience.com, https://www.livescience.com/death-rate-lower-than-estimates.html (death rate is around .66%).

[6] *See This is where all 50 states stand on reopening*, CNN.com, https://www.cnn.com/inter active/2020/us/states-reopen-coronavirus-trnd/.

[7] *See Coronavirus disease (COVID-19) advice for the public*, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public; *Stop the Spread of Germs*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/stop-the-spread-of-germs.pdf

[8] *Coronavirus, Social and Physical Distancing and Self-Quarantine*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/ coronavirus/coronavirus -social-distancing-and-self-quarantine.

4

in-person election where COVID-19 cases did not spike.[9]

**B.   Virginia's absentee-ballot requirements, election, and Plan**

Virginia law allows a few limited categories of individuals to vote absentee, including (inter alia) "[a]ny duly registered person with a disability, as defined in § 24.2-101, who is unable to go in person to the polls on the day of election because of his disability, illness, or pregnancy." Va. Code § 24.2-700(4). "'Person with a disability' means a person with a disability as defined by the Virginians with Disabilities Act[.]" *Id.* at § 24.2-101. The General Assembly recently expanded absentee voting to any registered voter.[10] But this change does *not* take effect until July 1, 2020. The legislature did not expand the limited absentee voting categories for the June 23 primary. In doing so, the legislature determined that the limited categories for absentee voting were necessary for this primary. Despite change not taking effect until July 1, Defendants issued guidance, contrary to Virginia law, that any "Voters may choose reason '2A My disability or illness' for absentee voting in the May and June 2020 elections due to COVID-19."[11] This allows all voters to vote absentee without *currently* having a disability or illness. The Commissioner of Elections has limited emergency authority "to designate alternative methods and procedures to handle [ ] applications and ballots" if there is an emergency "that will not allow sufficient time for the distribution and handling of absentee ballot applications and absentee ballot [for qualified voters.]" Va. Code § 24.2-713. This emergency authority has not been triggered since there is

---

[9] *Two weeks after election, COVID-19 cases have not spiked in Wisconsin but experts urge caution about conclusions*, Milwaukee Journal Sentinel, https://www.jsonline.com/story/news/2020/04/22/covid-19-hasnt-spiked-after-wisconsin-election-experts-urge-caution/2997394001/.

[10] See Virginia's Legislative Information System, *2020 Session*, § 24.2-700, *available at* https://lis.virginia.gov/cgi-bin/0legp604.exe?201+ful+HB1ER.

[11] Va. Dep't of Elections, *Absentee Voting*, https://www.elections.virginia.gov/casting-a-ballot/absentee-voting/.

sufficient time to distribute and handle absentee ballots and applications, though the Plan itself will cause disenfranchisement due to the intended, sudden flood of absentee ballots. The Virginia Republican and Democratic primaries on June 23 both have federal offices on the ballot.[12]

## C.  Absentee ballot fraud risk

Virginia history, past and present, is riddled with examples of voter fraud. Evidence of voter fraud in the Commonwealth starts as early as the 1960's when a federal probe resulted in mail ballot fraud charges.[13] There were similar allegations in the 1970s and 1980s. *Id.* In 2004, 15 individuals were convicted of voter fraud after conspiring to manipulate the elections in Appalachia through various unlawful means, including buying votes, stealing absentee ballots, and forging ballots.[14] In 2016, there was an FBI investigation after 20 voter applications were made under the names of dead people.[15] And most recently, in 2018, a man committed voter fraud when he attempted to cast absentee ballots for both himself and his deceased wife.[16]

Vote buying, coercion, and fraud occur with mail-in voting, as courts have recognized, so

---

[12] Va. Dep't of Elections, *Certified Candidates in Ballot Order for June 23, 2020 Primary Elections*, https://www.elections.virginia.gov/media/castyourballot/candidatelist/June-2020-Primary-Candidates-List-(4)-1.pdf.

[13] Laurence Hammack, *Trial Begins Form Mayor Charges Election Violations*, THE ROANOKE TIMES, July 19, 2006, https://www.roanoke.com/archive/trial-begins-for-former-mayor-charged-with-election-violations/article_e018b5b2-86c8-5c10-90b1-0b0dd05685a5.html.

[14] Laurence Hammack, *Ex-Mayor to Plead Guilty in Fraud Case,* THE ROANOKE TIMES, Nov. 9, 2006, https://www.roanoke.com/archive/ex-mayor-to-plead-guilty-in-vote-fraud-case/article_a5bb2cd8-a966-559a-ac3c-ffd955dc520b.html.

[15] Graham Moomaw, *Investigation Launched After Dead People Are Registered to Vote In Harrisonburg*, Richmond Times-Dispatch, Sept. 29, 2016, https://www.richmond.com/news/virginia/investigation-launched-after-dead-people-are-registered-to-vote-in/article_e008ce00-0365-57a2-95c0-4d9aa70012f9.html.

[16] *See* Steve Roberts, Jr., *Court Docs: James City Man Indicted on Voter Fraud Charges*, THE MORNING CALL, April 9, 2019, https://www.mcall.com/va-vg-richard-dohmen-indicted-0409-story.html.

the risk is a recognized issue and interest that need not be proven.[17] Nonetheless, examples outside Virginia abound.[18] In *U.S. v. Brown,* mail-in ballots were required to be notarized and notaries were sent to steal ballots from mailboxes and fill them out fraudulently, largely targeting impoverished minorities. 494 F. Supp. 2d 440, 457 (2007).[19] Absentee ballots can be filled out in private by someone other than the voter or by voters subject to undue influence. An Oregon survey found 5% of polled voters admitted someone else filled out their ballot.[20] Absentee ballots have been filled out fraudulently for ineligible, false, impersonated, or duplicate voter registrations.[21]

So it is unsurprising that The Heritage Foundation has been able to compile *A Sampling of Recent Election Fraud Cases from Across the United States* with1,285 cases of documented voter fraud in recent years. *See* https://www.heritage.org/voterfraud.[22]

[17] *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191-97 (2008); *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004).

[18] *See, e.g.*, M. Fernandez, *Texas Vote-Buying Case Casts Glare on Tradition of Election Day Goads*, N.Y. Times, Jan. 12, 2014, https://www.nytimes.com/2014/01/13/us/politics/texas-vote-buying-case-casts-glare-on-tradition-of-election-day-goads.html; P. Elliott, *Why North Carolina's Election Fraud Hurts American Democracy*, Time USA Mag. Feb. 22, 2019, https://time.com/5535292/northcarolina-election-fraud/.

[19] *See also* R. Gonzales, *North Carolina GOP Operative Faces New Felony Charges That Allege Ballot Fraud*, NPR, July 30, 2019, https://www.npr.org/2019/07/30/746800630/north-carolina-gop-operative-faces-new-felonycharges-that-allege-ballot-fraud; F. Lucas, *15 Election Results That Were Tossed Over Fraudulent Mail-In Ballots,* Daily Sig. (2020), https://www.dailysignal.com/2020/04/21/15-election-results-that-were-thrown-out-because-of-fraudulent-mail-in-ballots/.

[20] *A 'Modern' Democracy That Can't Count Votes*, Los Angeles Times, Dec. 11, 2000, https://www.latimes.com/archives/la-xpm-2000-dec-11-mn-64090-story.html.

[21] *See, e.g., U.S. Has 3.5 Million More Registered Voters Than Live Adults—A Red Flag For Electoral Fraud*, Investor's Business Daily, Aug. 16, 2017, https://www.investors.com/politics/editorials/u-s-has-3-5-million-more-registered-voters-than-live-adults-a-red-flag-for-electoral-fraud/; *Oregon AG gets guilty plea voter fraud case*, Oregon Catalyst, Sept. 18, 2010, https://oregoncatalyst.com/3510-oregon-ag-gets-guilty-plea-voter-fraud-case.html.

[22] *See also* K. Samalis-Aldrich & H. von Spakovsky, *Database Swells to 1,285 Proven Cases of Voter Fraud in America*, Daily Signal, May 9, 2020, https://www.dailysig-

Given the cost of printing and postage, ballot tracking, and staffing, mail-in voting proves far more expensive and complicated than in-person voting. Recently the Brennan Center estimated costs of "maintaining in-person voting" nationally as $271.4 million. The estimated national cost for an all "vote by mail option" was $982 million – $1.4 billion.[23] *See also* Declaration of Judy Flaig, Doc. 1-1, at 4-5 (discussing additional expenses with absentee-voting).

## D. Problems with a sudden flood of mailed ballots

With a sudden flood of absentee ballots requested, many applicants are unlikely to receive their ballot. *See RNC v. DNC*, 206 L. Ed. 2d 452, 457; 2020 U.S. LEXIS 2195; 140 S. Ct. 1205(2020) (Ginsberg, J. dissenting) (the "surge in absentee-ballot requests has overwhelmed election officials, who face a huge backlog in sending ballots"). According to the Wisconsin Election Commission Administrator, several bins containing numerous ballots were found by state officials undelivered after the election, either "on their way to voters or already filled out and on their way back to clerks."[24] Further, there were reports that over 9000 voters who requested a ballot by mail never received one.[25]

nal.com/2020/05/09/databaseswells-to-1285-proven-cases-of-voter-fraud-in-america/; The Heritage Foundation, *Standards for Absentee Ballots and All-Mail Elections: Doing It Right…and Doing It Wrong*, https://www.heritage.org/sites/default/files/2020-05/FS_188_NEW.pdf; H. von Spakovsky & J. Adams, *COVID-19 and Ebola: What We Can Learn from Prior Elections*, https://www.heritage.org/election-integrity/report/covid-19-and-ebola-what-we-can-learn-prior-elections (how Wisconsin and Liberia held safe elections in pandemics); H. Spakovsky, Potential for Fraud Is Why Mail-In Elections Should Be Dead Letter, Apr. 10, 2020, https://www.heritage.org/election-integrity/commentary/potential-fraud-why-mail-elections-should-be-dead-letter.

[23] Lawrence Norden et al., Report: Estimated Costs of Covid-19 Election Resiliency Measures Brennan Center for Justice (2020), https://www.brennancenter.org/our-work/research-reports/estimated-costs-covid-19-election-resiliency-measures .

[24] Patrick Marley, Alison Dirr & Mary Spicuzza, *Wisconsin is discovering problems with absentee ballots, including hundreds that were never delivered*, Milwaukee Journal Sentinel, April 8, 2020, https://www.jsonline.com/story/news/politics/elections/2020/04/08/wisconsin-election-3-tubs-ballots-found-mail-processing-center/2971078001/ (last visited Apr 25, 2020).

[25] Nick Corasaniti & Stephanie Saul, *Inside Wisconsin's Election Mess: Thousands of Miss-

In Virginia, the number of voters voting by mail is roughly 5-10% for normal elections. *Id*. A sudden dramatic increase in absentee ballots, would be a logistical nightmare and increases the risk of disenfranchisement. *Id*. Virginia does not have the necessary equipment, infrastructure, or processes to deal with a dramatic increase in absentee ballots. *Id*. Nor does it have a reliable way to track ballots. *Id*. Moreover, Virginia Election Offices will not have enough staff, space, or secure storage to deal with a large influx of absentee ballots which will result in more mistakes and greatly increases the risk of ballots being misplaced, lost, or tampered with. *Id*.

Human error exists in all elections, especially in Virginia where almost all of the absentee process is done by hand. *Id*. These errors would be sure to increase if an elections office is overwhelmed with applications and ballots. *Id*.

USPS is also not equipped to deal with a significant increase of absentee ballots. In past elections, there have been issues with USPS and ballots showing up after the election or being lost. *Id*. These issues would certainly increase if there were a sudden increase of absentee ballots. *Id*. And USPS has already requested additional federal funding as they have been stretched thin to the brink of breakdown.[26] There are yet no funding appropriations for USPS operations in response to the surge in mail-in voting, and even when funding arrives, improving staffing and capacity will take time.

### E.  Injuries and irreparable harm to plaintiffs

Plaintiffs are eligible and registered voters, who are qualified to and intend to vote in the

---

*ing or Nullified Ballots*, The New York Times, April 9, 2020,
https://www.nytimes.com/2020/04/09/us/politics/wisconsin-election- absentee-coronavirus.html
(last visited Apr 24, 2020).

[26]  Nicholas Fandos & Jim Tankersly, *Coronavirus Is Threatening One of Government's Steadiest Services: The Mail*, The New York Times, 2020,
https://www.nytimes.com/2020/04/09/us/politics/coronavirus-is-threatening-one-of-governments
-steadiest-services-the-mail.html (last visited Apr 26, 2020).

upcoming primary of the political party of their choice. Complaint, Doc. 1, at ¶¶ 5-12. Plaintiffs Thomas Curtin, Suzanne Spikes, Kelley Pinzon, and Carol D. Fox intend to vote in person. Plaintiffs Donna Curtin, and Tom Cranmer qualify to vote absentee and intend to do so for the upcoming primary. All Plaintiffs will be disenfranchised in the upcoming primary if the Plan remains in place. First, the flood of ballots that will be beyond the abilities of USPS and election workers (who were all expecting and preparing for the normal number of absentee ballots) to adequately handle, resulting in ballots not sent, lost ballots, and tardy ballots, resulting in direct disenfranchisement. Second, the flood of ballots will be beyond the abilities of election workers to adequately process, resulting in more illegal ballots and vote-dilution disenfranchisement.

## Argument

To obtain a preliminary injunction, Plaintiffs must establish (1) likely merits success, (2) likely irreparable harm, (3) a favorable balance of harms, and (4) that the injunction serves the public interest. *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network*, 722 F.3d 591, 595 (4th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). On the merits-success prong, "the burdens at the preliminary injunction stage track the burdens at trial," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006), so Defendants bear the burden to defend the Plan. Here, each *Winter* factor decisively favors Plaintiffs. The Court may and should "take judicial notice of official government reports and statistics." *United States v. Cecil*, 836 F.2d 1431, 1452 (4th Cir. 1988) (internal citations omitted).

## I.

**Plaintiffs are likely to prevail on the merits because the First and Fourteenth Amendments, and Article I, § 4, cl. 1, require Virginia to follow the absentee-ballot safeguards the legislature found essential to prevent disenfranchisement and protect election integrity.**

Plaintiffs are likely to prevail on the merits because (**A**) only the legislature can lawfully

balance ballot access and ballot fraud, and it held that its current law is required in *this* election for *this* state. Based on what the legislature decided, the Plan will cause (**B**) direct disenfranchisement and (**C**) vote-dilution disenfranchisement. The Plan (**D**) is inconsistent with Article I, § 4, cl. 1, which must control. And the Plan (**E**) violates the Due Process Clause because the Plan's interpretation that current disability and illness includes speculative, future possibilities of disability and illness is unreasonable, arbitrary, and capricious.

A. **Only the General Assembly may lawfully balance ballot access with election integrity, so its present requirement for obtaining an absentee ballot must be followed, and its balancing establishes as a matter of law the presence of disenfranchisement risks.**

The U.S. Constitution "confers on states broad authority to regulate the conduct of elections, including federal ones." *Griffin*, 385 F.3d at 1130 (citing U.S. Const. art I, § 4, cl.1). *See also, e.g.*, *Storer v. Brown*, 415 U.S. 724, 729-30 (1974); *Marston v. Lewis*, 410 U.S. 679, 681 (1973). "[S]triking ... the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a *legislative* judgment . . . ." *Griffin*, 385 F.3d at 1131 (emphasis added). As *Griffin* established, there is no constitutional right to vote absentee and absentee ballots pose special risks of ballot fraud, so only the legislature has the authority and is equipped to balance access and integrity in the absentee-ballot context. *Id.* at 1130-31.

Nor can the legislative judgment be gainsaid because less-restricted absentee ballots are allowed elsewhere since some states *do* have similar limitations, *id.* at 1131, and "states that have more liberal positions for absentee voting may well have different political cultures ..., cultures less hospitable to election fraud." *Id.* So "[o]ne size need not fit all." *Id.*

Nor can the legislative judgment be gainsaid on the notion that this safeguard isn't needed because the legislature provided others. The legislature thought they *all* were required in its balancing. Specifically, as *Griffin* and *Crawford*, 553 U.S. at 193-96, recognize there is a known

11

and greater risk of ballot fraud with absentee ballots than in-person voting. Knowing that risk, the legislature tightens or loosens absentee-ballot access to control the approximate *number* of absentee ballots on the basis of perceived risk of ballot fraud. If the risk of absentee-ballot fraud is deemed high, reducing the number of absentee ballots reduces the impact of absent-ballot vote fraud. And controlling the approximate *number* of mailed ballots is essential to prevent direct disenfranchisement because USPS and election workers are overwhelmed by a sudden flood of mailed ballots for which they were unable to plan, resulting in lost and tardy ballots and vote-dilution because overwhelmed screeners are unable to do as careful a job of screening out illegal ballots. Defendants decision to dramatically alter the number of absentee ballots by throwing access wide open vitiates the legislature's careful balancing and safeguards and poses serious risks of direct and vote-dilution disenfranchisement. Other safeguards cannot repair the lost legislative balancing. The risk-tolerance level is not the risk-tolerance level the legislature found essential for this election in this state to prevent such disenfranchisement and safeguard the integrity of the election.

The legislature's decision, based on its special authority and expertise to balance these competing interests, is that for *this* primary election in *this* state, restricting absentee ballots to those *currently* disabled or sick is essential to prevent direct disenfranchisement and vote-dilution disenfranchisement and to protect the integrity of the election. The legislature did not balance the competing interests and find that allowing those who *might* become ill (and whose illness *might* be actually caused by the voting experience and *might* be more than a mild case) would not cause disenfranchisement, vote fraud, and damage election integrity. The fact that the legislature chose to allow a different plan for elections *after* July 1 only highlights that for *this* election it prescribed a specific manner to be enforced for absentee ballots. Essential to the legislature's

determination for this election was necessarily the prevention of the unprepared-for surge of absentee ballots that will result from easing absentee-ballot access. It implemented that for the November election so that there would be adequate time for all necessary entities to prepare for the flood.

The legislature's safeguards, including its vital balance of absent ballot access and election integrity, are essential because "confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy" and "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The Seventh Circuit recently stayed an injunction by the U.S. District Court for the Western District of Wisconsin because it had given inadequate attention to the interest in preventing voter fraud by eliminating a witness requirement for absentee-ballot signatures: "This court is concerned with the overbreadth of the district court's order, which categorically eliminates the witness requirement applicable to absentee ballots and gives no effect to the state's substantial interest in combating voter fraud." *Democratic National Committee v. Bostelmann*, slip op. 3, Nos. 20-1538, 20-1539, 20-1545 & 20-1546 (7th Cir. Apr. 3, 2020) (citing *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004)), *available at* https://moritzlaw.osu.edu/electionlaw/litigation/documents/DNC_v_Bost_BL-30.pdf. Defendants here have likewise made absentee-ballot access overbroad and given inadequate effect to the legislature's balancing.

**B. Discarding the General Assembly's determination that only currently disabled or ill voters may vote absentee violates the right to vote by causing numerous voters to suffer *direct* disenfranchisement.**

The Plan authorizes obtaining absentee ballots, not because one is *currently* disabled or ill, but because one fears *getting* COVID-19. Defendants are actively encouraging voters to do this, so they intend to and will generate a flood of mailed ballots far above levels for which USPS and

13

election authorities have prepared—and on short notice[27]—causing direct disenfranchisement.

An ordinary "state election law" is reviewed under the test in *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But here, the actual "state election law" is not being challenged. Rather the Plan usurped the state election law, and Plaintiffs defend the actual state election law. Nonetheless, the Plan fails under the *Burdick* test, which requires "weighing 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (citation omitted). Strict scrutiny applies to "'severe' restrictions," but "reasonable, nondiscriminatory restrictions" only get rational-basis review and typically survive. *Id.* at 434. Because disenfranchisement is a severe burden, *see, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012), Defendants must prove the Plan narrowly tailored to a compelling governmental interest.

---

[27] In *Purcell*, 549 U.S. 1 (2006), the Supreme Court recognized that voting-rule changes near an election *themselves* "result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase," *id.* at 4-5. So near-election changes are discouraged. Because that principle is anchored in the right to vote, its logic applies to Defendants who changed the rules near an election because their actions pose that risk. Of course this court can *repair* near-election changes that violate constitutional rights, as the Supreme Court recently did in *Republican National Committee v. Democratic National Committee*, No. 19A1016, 2020 U.S. LEXIS 2195 (U.S. Apr. 6, 2020) (per curiam), though *RNC* said "courts should *ordinarily* not alter the election rules on the eve of an election." 2020 U.S. LEXIS 2195, at **2-3 (emphasis added). But *RNC* stayed an order allowing voters to mail absentee ballots after election day. *RNC* recited various problems that the lower-court order posed and said they "underscore[] the wisdom of the *Purcell* principle." *Id.* at **3. A crucial point was that the lower-court order "fundamentally alters the nature of the election." *Id.* Here, Defendants have fundamentally altered the nature of absentee-ballot voting and that near-election harm should be repaired here. *RNC* shows that Defendants cannot do a *Purcell* principle violation and then assert that principle to avoid judicial review to protect fundamental rights.

1. **A sudden increase in mailed ballots beyond what the General Assembly authorized will cause numerous voters to suffer direct disenfranchisement.**

As established in *Burdick*, once a voter challenges a provision, the justification of that provision requires examining the impact on all voters. Mr. Burdick wanted to do banned write-in voting, but the Court held that "[i]t is critical to understand that [his] case is not an isolated example," and "at least some voters would cast write-in votes for other candidates if given the option. 504 U.S. at 442-43. Based on that analysis, the impact on all voters must be considered here.

As evidenced by the factual record detailed above, *supra* at 8-9, recent experience with large surges in the number of mailed ballots has caused numerous voters to suffer direct disenfranchisement. For example, in Wisconsin, there was no sudden spike in COVID-19 cases after the in-person primary. *See supra* at 4-5. A sudden, large surge in absentee ballots is certain and that is precisely what Defendants' intend with their all-corners Plan. And experience indicates that the resulting large surge in mailed ballots will result in disenfranchisement from lost or tardy ballots coming and going through USPS from and to election workers, with both postal and election workers overwhelmed by the flood of mailed ballots; increased mistakes and errors from election workers; and lack of secure storage which increases the risk of boxes being misplaced, lost, or tampered with. *See* Declaration of Judy Flaig, Doc. 1-1; *see supra* at 8-10. Though the foregoing suffices to establish that numerous voters will be disenfranchised, it is vital to note that the *legislature* found its own limit on absentee ballots to be *necessary* in *this* election. A change in the law effective July 1, will open absentee-ballot access for the November election for which there will be time for postal and election workers to prepare for that surge. But the legislature found it necessary to restrict access for this election. That establishes the disenfranchisement harm as a matter of law.

15

2.   **In-person voting is an essential activity that may be safely pursued following safety guidelines for those engaging in other essential activities and is no greater burden than that held "reasonable" in *Crawford*.**

In-person voting is an essential activity, like going to the grocery. And the same safety guidelines that apply to grocery shopping to protect the public will be applied to in-person voting. Those public-safety measures (social distancing, sanitizing, masks, etc.) are designed specifically to keep people safe while doing essential activities. Wisconsin had an in-person election, with such safeguards, including plexiglass shields between election-board workers and voters, and there was no resulting spike in COVID-19. *See supra* at 4-5. Here the Governor already moved the federal primary from June 9 to June 23 (weeks from now) to allow subsiding dangers to further subside. Defendants' Plan is based on speculation of great risk based on models since shown to be flawed. But harms and risks associated with COVID-19 are receding and society is reopening, *see supra* at 2-5, which undercuts the purported justification for the Plan. So in a *Burdick* balancing any burden thought once to be posed by COVID-19 is downgraded because it is receding and should continue to do so over the next weeks.

A benchmark for a reasonable burden that readily survives a *Burdick* balancing is established in *Crawford*, 553 U.S. 181, which held it not unreasonable to require those lacking photo identification (required to vote) to bear "the inconvenience of going to the Bureau of Motor Vehicles, gathering required documents, and posing for a photograph" to get a free ID card because that did "not qualify as a substantial burden on most voters' right to vote . . ." *id.* at 198 (Stevens, J., joined by Roberts, C.J. and Kennedy, J.) (controlling op.). And that burden was mitigated by the fact that voters could vote a provisional ballot and then "travel to the circuit court clerk's office within 10 days to execute the required affidavit." *Id.* at199. And that burden in turn "is unlikely ... [to] pose a constitutional problem ...." *Id.* "And even assuming that the burden may not

16

be justified as to a few voters, that conclusion is by no means sufficient to establish" the facial

relief sought. *Id.* at 199-00. These reasonable burdens were closely related to legitimate state

interests in "election modernization" (including cleaning up voter roles recognized to contain

unqualified voters), preventing "voter fraud," and "safeguarding voter confidence." *Id.* at

192-97. *Crawford* recognized that vote fraud exists and is more associated with absentee ballots

than in-person voting. *Id.* at 194-96. Since the burden of required travel and inconvenience in

*Crawford* was reasonable and justified for the voter-identification requirement despite some pos-

sible harm to some persons, Defendants must prove any burden here is substantially greater and

not similarly a reasonable requirement for most people. But practicing the recommended safe-

guards for engaging in essential activities is not a greater burden than the burden found reason-

able in *Crawford*, so it is a reasonable, nondiscriminatory restriction that is readily justified in

balancing by state interests in election integrity. And even if the legislative mandate might be a

problem for a small number, that in no way justifies the facial replacement of the legislative

mandate with the Plan. *Id.* at 199-200.

### 3.  Applicable balancing establishes that the Plan violates the right to vote by *direct* disenfranchisement.

In balancing interests, recall that the legislature did the controlling balancing here in its leg-

islative mandate and Plaintiffs simply defend what the legislature decided is required for *this*

election in *this* state to avoid direct and vote-dilution disenfranchisement. That should control.

The legislature's authoritative balancing and *Burdick* balancing applied to the legislative

mandate itself will provide a solid analytical foundation for *Burdick* balancing applied to the

Plan. As to the legislative mandate, the restriction of absentee-ballot access to those *currently*

disabled or ill for *this* election in *this* state is a "reasonable, nondiscriminatory restriction" under

*Burdick*. Compared to the *Crawford* benchmark for what is reasonable, combining the legislative mandate on absentee ballot with in-person voting under prescribed precautions to safeguard individuals doing essential activities results in a burden on voters that is not less reasonable than the burdens found reasonable in *Crawford*. So the well-established state interests in preventing direct and vote-dilution disenfranchisement resulting from a sudden flood of absentee-ballot voting readily justify the original legislative mandate.

Given that the legislative mandate readily survives *Burdick* balancing, Defendants must justify usurping the legislative mandate with the Plan. Given that direct disenfranchisement is a severe burden, they must prove the Plan narrowly tailored to a compelling state interest. Preliminarily, note that the Plan applies a facial remedy, not one applied to those specially at risk, Defendants in essence challenged the legislative mandate and held it unconstitutional facially. So they must satisfy the *Salerno* test. *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid"). So at a minimum, the remedy the Plan imposes should have been as-applied to persons specially at risk. Instead, Defendants replaced the legislative mandate with an overbroad all-comers plan. That overbreadth alone makes the Plan indefensible even under a *Burdick* balancing. As the Supreme Court said when applying *Burdick* and *Salerno* in *Crawford*, one ought not invalidate the whole provision.

> A facial challenge must fail where the statute has plainly legitimate sweep. When we consider the statute's broad application to all Indiana voters, we conclude that it imposes only a limited burden on voters' rights. The precise interests are advanced by the State are therefore sufficient to defeat petitioners' facial challenge. ... [P]etitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute.

553 U.S. at 202-03 (quotation marks and citations omitted). *See also Bostelmann*, slip op. 3,[28] (lower court facial remedy "categorically eliminates the witness requirement applicable to absentee ballots and gives no effect to the state's substantial interest in combating voter fraud"). The Plan's facial-remedy overbreadth alone dooms it.

Turning to a *Burdick* balancing of the Plan, the foregoing tailoring analyses show that Defendants cannot meet their burden to prove that their facial remedy is narrowly tailored to a compelling state interest. And since the burden follows the burden at trial, it is their burden. Defendants will say COVID-19 made the Plan necessary because without it the legislative mandate would have caused disenfranchisement. But that fails for at least three reasons.

First, for disenfranchisement to compel a change to the legislative mandate, there must have been state action. But no state action would have caused the disenfranchisement, rather any disenfranchisement would result from COVID-19 concerns and personal choices as to how to react to them. Civil-rights claims require state action. But COVID-19 and resulting problems "are not impediments created by the State." *Bethea v. Deal*, 2016 WL 6123241, at *2 (S.D. Ga. Oct 19, 2016). Defendants believe the Commonwealth has passive liability for not *changing* its law in the face of issues not of its making, which is not the sort of claims *Burdick* balances. *Bethea*, *id.* at *2-3 (no "precedent that would constitutionally or statutorily mandate that Defendants provide an extension in the absence of any actual government action that burdens an individual's right to vote"). In sum, the legislative mandate did not, could not, cause disenfranchisement.

Second, the idea that the legislative mandate might cause elective, self-disenfranchisement due to COVID-19 is built on speculation likely based on early, badly flawed models of COVID-19 with an erroneously high fatality rate and exorbitant numbers of predicted death. But those

---

[28] *See* https://moritzlaw.osu.edu/electionlaw/litigation/documents/DNC_v_Bost_BL-30.pdf.

models proved wrong. Engaging in essential services, of which voting is one, has long been approved with recommended safeguards (social distancing, hand washing, sanitizing, masks, etc.). Complaint, Doc. 1, at ¶¶ 25-28, 33-36. Unlike the early predictions, the spread of the virus is being controlled, the fatality rate is decreasing rapidly, testing is more readily available and widespread to better detect who has antibodies and who has active disease (so they can be isolated),[29] the death rate is much lower than originally expected, and society is reopening as a result of all these improvements. *Id*. at ¶¶ 30-32. These are all things of which this court can and should take judicial notice. There is no reason that most people can't vote following recommended safeguards that are designed for the very purpose of protecting those engaged in such essential services, just as they can go to the grocery store with those safeguards. In fact, Wisconsin's recent primary shows that in-person voting could be held even earlier in the COVID-19 outbreak with the usual safeguards for essential activities without a resulting spike in COVID-19 caused by voting. *See supra* at 4-5; Complaint, Doc. 1, at ¶¶ 34-36. So the notion that individuals must choose between voting and their health is overblown and overbroad. If there were ever any validity to the notion that "government action" by *inaction* was disenfranchising persons because some thought they had to choose voting or their health, that notion is now invalid for most people. So there was no justification for the Plan's facial remedy.

Third, we now know from experience, that the sudden flood of mailed ballots, which Defendants enable and intend, *itself* causes disenfranchisement. *See supra* at 8-10; Complaint (Doc. 1), at ¶¶ 46-62. So numerous voters across the Commonwealth will be disenfranchised by the Plan.

Consequently, Defendants cannot prove that the Plan is narrowly tailored. We know it is *not*

---

[29] As herd immunity to viruses typically develops as more people get the virus and recover, Defendants would have to prove that this would not be the case with this virus.

narrowly tailored because it overbroadly provides an all-comers plan for absentee ballots, though *Crawford* rejected such a facial remedy untailored to those who might actually have cognizable harm. Absent tailoring, there is no need to go to the asserted interest in protecting the public from overblown COVID-19 models now proven erroneous and consequently no longer compelling (if they once were) when most people will be just fine with the recommended safeguards for essential activity. And in the balancing we now know from experience that the Plan will *cause*, not prevent direct disenfranchisement, so it fails its *Burdick* balancing and must be enjoined.

**C.  Discarding the General Assembly's determination that only *currently* disabled or ill voters may vote absentee violates the right to vote by causing numerous voters to suffer *vote-dilution* disenfranchisement.**

The legislative mandate provides only limited access to absentee ballots for this election. So the legislature determined (by its sole balancing authority and expertise) that most voters should vote with the safeguards that accompany in-person voting and only a limited, defined class of persons with special needs should be able to vote absentee. The Plan intends to and will cause a flood of new absentee ballots. But as the legislative mandate indicates by its limitation for this election, the legislature has determined that given the known risk of absent-ballot fraud the percentage of absentee votes must be limited. That balancing and judgment may not be gainsaid. As a result of the forbidden increase in absentee votes and resulting increase in illegal votes, votes cast by legal voters will be diluted, and vote dilution is a form of forbidden disenfranchisement.

The federal right to vote is fundamental, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966), and well-established: "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections" and to have that vote counted. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." *Id.* at 555 (in-

ternal citations omitted). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.*

Since the Plan will allow a flood of absentee votes beyond what the legislature determined to be a safe percentage for this election,[30] given the well-recognized risk of absent-ballot fraud, numerous voters will have their votes diluted by illegal votes. Vote dilution, identified in *Reynolds* and *Bush v. Gore*, 531 U.S. 98 (2000), is readily apparent where illegal votes are allowed. Only the votes of eligible, registered voters are supposed to be cast and counted. So every legitimate voter is one of the total number of legitimate voters. For example, if the legitimate voter's vote is one of ten legitimate votes cast, her vote is worth one tenth of the total. But if, in addition, ten illegal votes are cast, her vote is now worth one twentieth of the total. So her vote was debased by half as a result of vote dilution. That violates her constitutional right to vote by vote-dilution disenfranchisement.

Under *Burdick*, Defendants must justify the Plan under strict scrutiny because disenfranchisement is a severe burden. So Defendants must again establish that the Plan is narrowly tailored to a compelling state interest. As just established in Part I.B, the Plan fails strict scrutiny because it is not narrowly tailored, it's purported interest is not compelling, and the Plan actually *causes* disenfranchisement. That analysis applies here too.

If Defendants argue that Plaintiffs lack standing because their vote-dilution claim is a generalized grievance, that argument fails for two distinct reasons arising form the generalized-grievance test as stated in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Preliminarily, note the

---

[30] In Virginia, the number of voters voting by mail is roughly 5-10% for normal elections. *See* Declaration of Judy Flaig, Doc. 1-1, at 2.

generalized-grievance formulation in *Lujan*: "a plaintiff raising only a generally available grievance about government—claiming only harm to his and *every citizens*'s interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy," *id.* at 560-61 (emphasis added), and "an injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable . . . [and] cannot alone satisfy the requirements of Art. III without draining those requirements of meaning," *id.* at 575-76 (internal quotation marks and citation omitted). So there are two questions in Lujan's analysis: (1) is the claimant just a *citizen* trying to make the government do its job without more? and (2) is the claim the same claim held by "the public at large" or "every citizen"? Because the first of these questions is more specific, it is the core of the analysis. "[T]he proper inquiry is whether the plaintiffs sue solely as *citizens* who insist that the government follows the law." *Andrade v. NAACP of Austin*, 345 S.W.3d 1, (Tex. 2011) (citing E. Chemerinsky, *Constitutional Law: Principles and Policies* 91 (3d ed. 2006)) (emphasis added). "[N]either *citizens* nor taxpayers can appear before a court simply to insist that the government and its officials adhere to the requirements of law." C.A. Wright et al., *Federal Practice & Procedure* § 3531.10 (3d ed. 2008) (emphasis added). So mere "citizen" standing is the issue, and the present challenge is not a generalized grievance under the first or second question.

First, Plaintiffs don't bring their vote-dilution claim under mere "citizen" standing. Rather, they assert a personal harm from the violation of their own fundamental right to vote that is protected by the First and Fourteenth Amendments. So they are not just "citizens" merely trying to make the government do its job. They assert a constitutionally protected right, and given the Supremacy Clause, U.S. Const. art. IV, para. 2, state officials must obey constitutional mandates.

23

Moreover, Plaintiffs' claim meets this test due to the particularized nature of their challenge. They don't challenge the Governor's moving of the election or anything not directly bearing on their vote-dilution claim, so they are not just trying to make the government do its job in some general way but rather challenge that which particularly violates their right to vote. Having resolved that core issue regarding mere citizen standing, the how-general question fades in importance, but it too is met here.

Second, Plaintiffs seek a benefit that is not the same as for every "citizen" and the "public at large." "The bar is based not on the number of people affected—a grievance is not generalized merely because it is suffered by large numbers of people." *Andrade*, 345 S.W.3d at 7 (citing Chemerinsky, *Constitutional Law* 91). "[D]enying standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. SCRAP*, 412 U.S. 660, 686-68 (1973). "[W]here a harm is concrete, though widely shared, the Court has found injury in fact." *FEC v. Akins*, 524 U.S. 11, 24 (1998). Plaintiffs' claim here is actually three levels of specificity below generalized "citizens." (1) Within the class of citizens are *registered voters*; only registered voters could possibly suffer vote dilution. (2) Within the class of registered voters are *eligible* voters; only the eligible have a right to vote and could thus suffer vote dilution. (3) Within the class of registered, eligible voters are those who *actually vote*; only those who actually vote can have their vote diluted by illegal votes. So Plaintiffs' vote-dilution claim is highly particularized and not even close to *Lujan*'s citizen-standing, public-at-large definition of a generalized grievance.

In sum, the Plan directly harms Plaintiff voters and large numbers of other registered, eligible voters who vote, because it will cause vote-dilution disenfranchisement, an outcome the leg-

islature expressly rejected for this election in its legislative mandate, which the Plan displaces.

**D.  Discarding the General Assembly's determination that only truly disabled or ill voters may vote absentee violates U.S. Constitution Article I, § 4, cl. 1, which mandates that the "Legislature prescribe the Manner" of the election.**

The Plan violates Plaintiffs' right to have, and to vote in, a federal election where the "Manner" of election is "prescribed . . . by the Legislature," as required:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1. Candidates for federal office are on the Primary ballot. So the Primary must be conducted in the legislature's prescribed manner. But the Plan is contrary to the legislative mandate. So the Plan violates Article I, § 4, cl. 1, including a violation of the Plaintiffs' right to have, and to vote in, such an election as the U.S. Constitution prescribes.

In *Bush v. Gore*, 531 U.S. 98 (2000), the U.S. Supreme Court listed a similar provision requiring that elections for presidential electors be conducted in the manner chosen by the Legislature as an issue in the case, but decided that it need not reach it because what the Florida Supreme Court had done fell so woefully short of what was required under the vote-dilution ban that the manner-of-election issue need not be reached. *Id.* at 103 ("whether the Florida Supreme Court established new standards for resolving Presidential election contests, thereby violating Art. II, § 1, cl. 2, of the United States Constitution"). Similarly here, the parallel Manner Clause issue need not need be reached because the disenfranchisement claims can readily decide the case. But if the Court doesn't decide this case on vote-dilution or another claim, the Plan violates Article I, § 4, cl. 1.

### E.   The Plan violates the Due Process Clause of the Fourteenth Amendment.

The legislative mandate permits voters to vote absentee in this election if they *currently* fit within a prescribed category, such as being pregnant or having a disability or illness. But the Plan allows voters who do *not currently* fit within a category to "choose reason '2A My disability or illness' for absentee voting in the May and June 2020 elections due to COVID-19." The Plan thus interprets *currently* to mean *might be later* due to a statistically unlikely case of COVID-19 that is *caused* by voting in an election conducted under recommended safeguards (and not some other exposure doing essential activities) and is *more than a mild case* (the risk of which would not be a more unreasonable burden than what *Crawford* approved), even though the disease is not state action (a necessity for civil-rights cases and *Burdick* balancing).

That new interpretation is irrational, arbitrary, and capricious because it is in no way authorized by the underlying legislative mandate for this election. For example, in *Bush* the Supreme Court considered "whether the use of standardless manual recounts violates the Equal Protection and Due Process Clauses." 531 U.S. at 103. The Court found that "it is not necessary to decide whether the Florida Supreme Court had the authority under the legislative scheme for resolving election disputes to define what a legal vote is and to mandate a manual recount implementing that definition," *id.* at 105, because "recount mechanisms implemented in response to the decisions of the Florida Supreme Court do not satisfy the minimum requirement for *nonarbitrary* treatment of voters necessary to secure the fundamental right," *id.* (emphasis added). *Bush* also noted that where *both* sides claim they are vindicating the right to vote, constitutional guarantees still control and distinct constitutional claims—there as here particularly vote dilution—such constitutional claims must be resolved using normal constitutional analysis. *Id.* at 105. Consequently, the Plan here violates the Due Process Clause of the Fourteenth Amendment, which re-

quires all government action to at least have a rational basis and be "nonarbitrary." The Plan is an arbitrary taking without due process of the protection against disenfranchisement that was provided by the legislative mandate.

## II.

### A preliminary injunction is necessary to prevent irreparable harm to Plaintiffs' constitutional rights.

Plaintiffs must "make a clear showing that [they] will suffer harm that is neither remote nor speculative, but actual and imminent. Additionally, the harm must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citations and internal quotation marks omitted), *cert. denied sub nom. Givens v. Mountain Valley Pipeline*, 140 S. Ct. 300 (2019).

Because "the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds*, 377 U.S. at 561–62 (1964), "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury," *League of Women Voters of N.C. v. North Carolina* ("*LWVNC*"), 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases). "[O]nce the election occurs, there can be no do-over and no redress," making the injury to "voters ... real and completely irreparable if nothing is done to enjoin [the challenged] law." *LWVNC*, 769 F.3d at 247. "[T]here are no mulligans" where voters are disenfranchised by denial of requested relief. *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016).

Absent requested relief, all Plaintiffs who are voters and numerous others will suffer vote-dilution disenfranchisement caused by the sudden, intended flood of ballots that will be beyond the abilities of election workers (who were expecting and preparing for the normal number of absentee ballots) to adequately monitor, resulting in more illegal ballots. Illegal ballots dilute

legal ballots, resulting in vote-dilution disenfranchisement. *See supra* at 9.

Absent requested relief, Plaintiffs who are properly qualified to vote absentee and intend to do so and numerous others will suffer direct disenfranchisement caused by the sudden, intended flood of ballots that will be beyond the abilities of USPS and election workers (who were all expecting and preparing for the normal number of absentee ballots) to adequately handle, resulting in ballots not sent, lost coming or going, and tardy, resulting in direct disenfranchisement. *See supra* at 8-10.

Finally, harm to Plaintiffs is imminent. The election is June 23 and the Plan is in place and is being promoted and implemented. Meanwhile the dire prior projections about COVID-19 are proving wrong, so any justification for the Plan there might have been is far less than compelling now that states are opening up and recommended safeguards suffice for the safety of most in doing such essential activities as voting. An injunction is needed to stop the harm from the Plan.

## III.
### The balance of equities and the public interest support injunctive relief.

Where as here, Plaintiff voters will be disenfranchised, it is in the public interest that they be allowed to vote without direct or vote-dilution disenfranchisement. There is no harm to a state if likely unconstitutional actions are preliminarily enjoined. *See, e.g.*, *Giovani Carandola v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). "[U]pholding constitutional rights surely serves the public interest." *Id.* While safeguarding the public health is a traditional police power, the exercise of that power as the Plan does is unjustified by COVID-19 concerns because (i) for most persons the recommended safeguards for essential activities such as in-person voting will keep them safe, (ii) the Plan overbroadly and facially allows everyone to vote absentee without limiting the remedy (assuming *arguendo* it is authorized), so the balancing of harms and public interest was

impermissibly skewed by the Plan from the beginning, and (iii) we know from the experience in Wisconsin and elsewhere that the Plan itself will cause disenfranchisement due to the sudden flood of ballots, and such disenfranchisement is not in the public interest. And vitally, following the General Assembly's own balancing of access and election integrity for this election in this state, i.e., following the rule of law as expressed in the legislative mandate, is strongly in the public interest and should outweigh all because only the legislature is authorized and equipped to prescribe the manner of the election. Violating the fundamental rule as the Plan does is decidedly not in the public interest and undercuts our whole rule-of-law Republic and Commonwealth. So the balance of harms and public interest favor the requested relief.

## Conclusion

For the foregoing reasons, Plaintiffs seek a preliminary and permanent injunction: (A) prohibiting Defendants from implementing their unlawful interpretation of "disability or illness" and from allowing persons without disability or illness to vote absentee; (B) ordering Defendants to issue guidance instructing Virginia voters that they may only vote absentee if they qualify under the statutory categories and definitions; (C) ordering Defendants, in coordination with city and county election officials, to conduct a public information campaign informing Virginia voters that they may only check "disability or illness" if they are disabled, ill, or pregnant, as statutorily defined, and (D) ordering Defendants, in coordination with city and county election officials, to contact any Virginia voters who claimed a disability or illness (1) for the first time and (2) whose absentee application was submitted after Defendants issued guidance using their unlawful interpretation of "disability or illness," to (i) inquire whether the voter marked the box according to Defendants' unlawful guidance, and (ii) if so, inform the voter may only vote absentee if they qualify under the statutory categories and definitions.

29

Date: May 13, 2020

Respectfully Submitted,

_____/s/_____

Bradley P. Marrs (VSB#25281)
Patrick C. Henry II (VSB#80468)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA 23226
(804) 662-5715
(804) 662-5712 (fax)
bmarrs@marrs-henry.com
phenry@marrs-henry.com

*Local Counsel for Plaintiffs*

James Bopp, Jr.*
  IN Atty. No. 2838-84
Richard E. Coleson*
     IN Atty. No. 11527-70
Courtney Turner Milbank*
  IN Atty. No. 32178-29
True the Vote, Inc.
  Voters' Rights Initiative
THE BOPP LAW FIRM, PC
1 South Sixth St.
Terre Haute, IN 47807-3510
Telephone: (812) 232-2434
E-mails: jboppjr@aol.com,
    rcoleson@bopplaw.com
    cmilbank@bopplaw.com

*Lead Counsel for Plaintiffs*

* Pro Hac Vice pending

# Certificate of Service

I hereby certify that the foregoing document was served electronically on this date, May 13, 2020, upon all counsel of record via the United States District Court for the Eastern District of Virginia, electronic filing system:

_____/s/_____

Bradley P. Marrs (VSB#25281)
Patrick C. Henry II (VSB#80468)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA 23226
(804) 662-5715
(804) 662-5712 (fax)
bmarrs@marrs-henry.com
phenry@marrs-henry.com

*Local Counsel for Plaintiffs*

James Bopp, Jr.*
  IN Atty. No. 2838-84
Richard E. Coleson*
   IN Atty. No. 11527-70
Courtney Turner Milbank*
  IN Atty. No. 32178-29
True the Vote, Inc.
  Voters' Rights Initiative
THE BOPP LAW FIRM, PC
1 South Sixth St.
Terre Haute, IN 47807-3510
Telephone: (812) 232-2434
E-mails: jboppjr@aol.com,
  rcoleson@bopplaw.com
  cmilbank@bopplaw.com

*Lead Counsel for Plaintiffs*

*\* Pro Hac Vice pending*

31