IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| THOMAS CURTIN, DONNA CURTIN, SUZANNE A. SPIKES, KELLEY PINZON, TOM CRANMER, and CAROL D. FOX | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:20-cv-00546 |
| v. | ) ) ) | |
| VIRGINIA STATE BOARD OF ELECTIONS; ROBERT H. BRINK, JOHN O'BANNON, and JAMILAH D. LECRUISE, in their official capacities as Chairman, Vice-Chair, and Secretary of the Virginia State Board of Elections, respectively, and CHRISTOPHER E. PIPER, in his official capacity as Commissioner of the Virginia Department of Elections, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Mark R. Herring
  *Attorney General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Donald D. Anderson (VSB No. 22114)
Samuel T. Towell (VSB No. 71512)
  *Deputy Attorneys General*

Heather Hays Lockerman (VSB No. 65535)
  *Senior Assistant Attorney General*

Jacqueline C. Hedblom (VSB No. 68234)
Carol L. Lewis (VSB No. 92362)
Erin R. McNeill (VSB No. 78816)
  *Assistant Attorneys General*

Toby J. Heytens (VSB No. 90788)
  *Solicitor General*

Michelle S. Kallen (VSB No. 93286)
Martine E. Cicconi (VSB No. 94542)
  *Deputy Solicitors General*

Jessica Merry Samuels (VSB No. 89537)
  *Assistant Solicitor General*

Zachary R. Glubiak (VSB No. 93984)
  *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ............................................................................................................... 1

STATEMENT ..................................................................................................................... 2

LEGAL STANDARD.......................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

    I.    Plaintiffs' arguments are based on a fundamental misunderstanding of Virginia's absentee voting laws................................................................................9

        A.   Virginia law permits voting by absentee ballots during a state of emergency ...........9

        B.   The COVID-19 Guidance is not contrary to Virginia's otherwise-applicable absentee voting laws .................................................................................10

    II.   Plaintiffs lack standing to seek injunctive relief................................................14

    III.  Plaintiffs are not entitled to a preliminary injunction.......................................20

        A.   Plaintiffs have not established that they are likely to succeed on the merits...........21

        B.   Plaintiffs have not shown that they are likely to suffer irreparable harm in the absence of preliminary relief .................................................................25

        C.   The balance of equities and public interest factors independently foreclose a grant of preliminary equitable relief ..........................................................25

CERTIFICATE OF SERVICE ......................................................................................... 31

# TABLE OF AUTHORITIES

Page

**Cases**

*American Civil Rights Union v. Martinez-Rivera*,
   166 F. Supp. 3d 779 (W.D. Tex. 2015) .................................................................................... 17

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ................................................................................................................. 22

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................................. 17

*Bishop v. Bartlett*,
   575 F.3d 419 (4th Cir. 2009) ................................................................................................... 14

*Burdick v. Takushi*, |
   504 U.S. 428 (1992) ................................................................................................................. 22

*Crawford v. Marion Cty. Election Bd.*,
   553 U.S. 181 (2008) ................................................................................................................. 26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*,
   528 U.S. 167 (2000) ................................................................................................................. 15

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*,
   452 U.S. 264 (1981); ............................................................................................................... 23

*Hutchinson v. Miller*,
   797 F.2d 1279 (4th Cir. 1986) ................................................................................................. 14

*Jacobson v. Massachusetts*,
   197 U.S. 11 (1905) ................................................................................................................... 21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................................... 15, 19, 20

*Marcellus v. Virginia State Bd. of Elections*,
   849 F.3d 169 (4th Cir. 2017) ................................................................................................... 22

*McGhee v. Granville Cty., N.C.*,
   860 F.2d 110 (4th Cir. 1988) ................................................................................................... 24

*Miller v. Brown*,
   462 F.3d 312 (4th Cir. 2006) ................................................................................................... 29

*National Fed'n of the Blind v. Lamone*,
   813 F.3d 494 (4th Cir. 2016) ................................................................................................... 28

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................................. 25

*Paher v. Cegavske*,
   No. 320CV00243MMDWGC, 2020 WL 2089813 (D. Nev. Apr. 30, 2020) .................... 17, 23

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) ................................................................................... 11

*People ex rel. Barmore v. Robertson*,
   134 N.E. 815 (Ill. 1922) .......................................................................... 14

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ................................................................... 1, 21, 23, 30

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   140 S. Ct. 1205 (2020) .............................................................................. 1

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974) ................................................................................. 20

*Simkins v. Gressette*,
   631 F.2d 287 (4th Cir. 1980) ................................................................. 29

*Spokeo Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ............................................................................. 15

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ................................................................................... 15

*Suarez Corp. Indus. v. McGraw*,
   125 F.3d 222 (4th Cir. 1997) ................................................................. 11

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ...................................................................... 14, 16, 19

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ................................................................................... 24

*United States v. Chalk*,
   441 F.2d 1277 (4th Cir. 1971) ............................................................... 21

*United States v. Salerno*,
   481 U.S. 739 (1987) ................................................................................. 23

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) .............................................................................. passim

*Workman v. Mingo Cty. Bd. of Educ.*,
   419 Fed. Appx. 348 (4th Cir. 2011) ..................................................... 23

## Constitutional Provisions

U.S. Const. art. I, § 4 ......................................................................................... 24

U.S. Const. art. I, § 4, cl. 1 ................................................................................ 24

Va. Const. art. IV, § 13 ....................................................................................... 22

## Statutory Provisions

42 U.S.C. § 1983 ................................................................................................... 7

Va. Code Ann. § 1-214(A)................................................................................. 22

Va. Code Ann. § 24.2- 1004(B) ....................................................................... 19

Va. Code Ann. § 24.2-101 ................................................................................ 10

Va. Code Ann. § 24.2-1012 .............................................................................. 19

Va. Code Ann. § 24.2-1016 .............................................................................. 19

Va. Code Ann. § 24.2-103(A) ........................................................................... 29

Va. Code Ann. § 24.2-603. ............................................................................... 10

Va. Code Ann. § 24.2-603.1 ................................................................... 5, 7, 9, 13

Va. Code Ann. § 24.2-612 ................................................................................... 7

Va. Code Ann. § 24.2-700 ................................................................................. 10

Va. Code Ann. § 24.2-700(4) .............................................................. 6, 10, 12, 24

Va. Code Ann. § 24.2-701(A) ........................................................................... 18

Va. Code Ann. § 24.2-701(B)(2) ......................................................................... 7

Va. Code Ann. § 24.2-701(C) ........................................................................... 18

Va. Code Ann. § 24.2-701(C)(6) ...................................................................... 12

Va. Code Ann. § 24.2-704 ................................................................................. 19

Va. Code Ann. § 24.2-706 ........................................................................... 18, 19

Va. Code Ann. § 24.2-710 ................................................................................. 19

Va. Code Ann. § 32.1-2 ..................................................................................... 13

Va. Code Ann. § 44-146.14(a) .......................................................................... 13

Va. Code Ann. § 44-146.16 ............................................................................... 13

Va. Code Ann. § 51.5-40.1 ............................................................................... 10

**Court Rules**

Fed. R. Civ. P. 12(h)(3)...................................................................................... 14

**Other Authorities**

Bill Chappell, *Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO Says*, NPR (Mar. 11, 2020)............................................................................................................ 2

Centers for Disease Control and Prevention, Recommendations for Election Polling Locations.. 5

Centers for Disease Control and Prevention, What You Can Do ................................. 22

Chad Cotti, et al., *The Relationship between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence from the Wisconsin Primary*, The National Bureau of Economic Research (May 11, 2020) ....................................................... 28

Coronavirus Disease 2019 (COVID-19), *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention ................................................................. 11

Council of State Gov'ts, COVID-19 Resources for State Leaders ................................................. 3

COVID-19 Case Data for Fairfax Health District .......................................................................... 2

Daphne Chen and John Diedrich,
*Two weeks after election, COVID-19 cases have not spiked in Wisconsin but experts urge caution about conclusions*, Milwaukee Journal Sentinel (Apr. 22, 2020) ........................ 27, 28

Executive Order Fifty-One (2020) (Northam) .................................................................................. 3

*Governor Northam Unveils Blueprint for Easing Public Health Restriction* (Blueprint), Office of the Governor of Virginia (Apr. 24, 2020) ................................................................. 4

Order Declaring a Judicial Emergency in Response to COVID-19 Emergency, Supreme Court of Virginia (Mar. 16, 2020) ................................................................................... 3

Order of Public Health Emergency Two (2020) (Northam & Oliver) ............................................. 3

Sui-Lee Wee & Donald G. McNeil Jr., *China Identifies New Virus Causing Pneumonia-like Illness*, N.Y. Times (Jan. 8, 2020) ............................................................................. 2

United States District Court Eastern District of Virginia, General Order No. 2020-12 (Apr. 10, 2020) ......................................................................................................................... 3

Univ. of Va., Biocomplexity Inst., *Estimation of COVID-19 Impact in Virginia* (April 13, 2020) 4

Updated Public Advisory Regarding Operating Procedures in Response to COVID-19 .............. 3

Va. Dep't of Health, *COVID-19 Data Insights* ............................................................................. 4

William Wan et al., *Experts and Trump's Advisers Doubt White House's 240,000 Coronavirus Deaths Estimate*, Wash. Post (Apr. 2, 2020) ............................................................. 21

## INTRODUCTION

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). In this case, plaintiffs ask this Court to do something even more extreme: alter the rules for an election period that has already started.

On March 17, 2020, Virginia's Department of Elections publicly announced that voters would be able to request, due to COVID-19, an absentee ballot for the upcoming primary. Two months later (and the week after absentee ballots were mailed to voters), plaintiffs—all of whom are personally free to vote in-person or absentee during the current election—challenge the availability of absentee voting to other voters. But plaintiffs lack standing because plaintiffs' alleged injuries are highly attenuated at best. Plaintiffs also misrepresent Virginia law and the General Assembly's goals when it comes to absentee voting. Finally, plaintiffs have fallen far short of meeting their heavy burden of showing an entitlement to a preliminary injunction.

Plaintiffs' request for a judicial rule change during the absentee voting period ignores the Supreme Court's caution that court orders affecting elections "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). Indeed, the relief plaintiffs seek would likely cause the very harms they claim they want to avoid: confusion, disenfranchisement, and last-minute changes. And the stakes here are even higher than in a typical case because the challenged actions protect not only citizens' right to vote, but also the health and safety of voters, poll workers, election officials, and others who would otherwise be at risk from a highly contagious virus. This Court should follow the wisdom of *Purcell* and refrain from taking any action that would cause voter confusion and risk unnecessarily exposing Virginians to a once-in-a-lifetime global pandemic.

## STATEMENT

1.      In early January, Chinese authorities announced that a novel coronavirus was likely to blame for "a mysterious, pneumonia[-]like illness."[1] COVID-19 has since become a global pandemic,[2] killing more than 319,000 and infecting more than 5 million people worldwide. Oliver Decl. ¶ 9. More than 1,000 people in Virginia have died—a number that continues to climb. ¶ 13. And more than 32,000 COVID-19 cases have been reported in the Commonwealth, including 6,000 new cases last week alone. ¶ 12. Fairfax County, where five of the six plaintiffs reside, has been hit particularly hard, with over 8,000 cases and nearly 300 deaths.[3] And because of limitations in testing capacity, these figures "likely undercount[] the actual number of positive cases." ¶ 12.

The toll extends beyond those infected. As those with COVID-19 require treatment and hospitalization, the burden on the healthcare system grows. Oliver Decl. ¶ 15. Depending on the speed of infection, Virginia could face a shortage of hospital beds, intensive-care-unit beds, and ventilators. ¶¶ 15, 20. Such shortages would place healthcare workers at even higher risk and prevent those needing treatment for unrelated reasons from accessing care. ¶ 15.

2.      One thing that makes COVID-19 so deadly is how easily it spreads. The virus is transferred by in-person interactions, through either close contact or respiratory droplets when an infected person coughs, sneezes, or talks. Oliver Decl. ¶ 6. Anyone can contract COVID-19, but

---

[1] Sui-Lee Wee & Donald G. McNeil Jr., *China Identifies New Virus Causing Pneumonia-like Illness*, N.Y. Times (Jan. 8, 2020), https://www.nytimes.com/2020/01/08/health/china-pneumonia-outbreak-virus.html.

[2] Bill Chappell, *Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO Says*, NPR (Mar. 11, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says.

[3] COVID-19 Case Data for Fairfax Health District, https://www.fairfaxcounty.gov/covid19/case-information (last visited May 20, 2020).

some people, including those over 65, are particularly vulnerable. ¶ 7. The virus can survive "for hours if not days" on surfaces such as plastic and metal. ¶ 23. And infected persons may not show symptoms—and thus may not realize they have contracted the virus—for days, if at all. ¶¶ 6–7.

3.      Lacking a vaccine or cure, federal, state, and local governments have focused on slowing COVID-19's spread. State officials have implemented that guidance by closing schools, requiring many businesses to close to the public, prohibiting gatherings of more than ten, and issuing stay-at-home orders.[4] This Court enacted emergency measures,[5] and the Fourth Circuit closed the Powell Courthouse to the public.[6]

Relying on input from some of the Nation's leading epidemiologists, doctors, and economists, Virginia has taken steps to limit COVID-19's spread. On February 7, the State Health Commissioner identified COVID-19 as a public health threat. Oliver Decl. ¶ 5. Over the next five weeks, Governor Ralph S. Northam declared a state of emergency,[7] the Chief Justice declared a judicial emergency,[8] and the Governor and State Health Commissioner jointly announced a public health emergency.[9]

These measures proved effective—by one model cutting the transmission rate in half,

---

[4] See Council of State Gov'ts, *COVID-19 Resources for State Leaders*, https://web.csg.org/covid19/executive-orders/ (last visited May 20, 2020); see also Oliver Decl. ¶ 18.

[5] United States District Court Eastern District of Virginia, General Order No. 2020-12 (Apr. 10, 2020).

[6] Updated Public Advisory Regarding Operating Procedures in Response to COVID-19, https://www.ca4.uscourts.gov/news-announcements/2020/05/11/updated-public-advisory-regarding-operating-procedures-in-response-to-covid-19 (May 20, 2020).

[7] See Executive Order Fifty-One (2020) (Northam).

[8] Order Declaring a Judicial Emergency in Response to COVID-19 Emergency, Supreme Court of Virginia (Mar. 16, 2020), http://www.courts.state.va.us/2020_0316_scv_order_declaration_of_judicial_emergency.pdf.

[9] Order of Public Health Emergency Two (2020) (Northam & Oliver).

Peake Decl. ¶ 8, and, by another model, preventing nearly 500,000 additional cases in Virginia alone.[10] But this progress is fragile, with experts cautioning that "lifting social distancing restrictions too soon [could] lead to a rapid increase of COVID-19 cases" and potentially "overwhelm Virginia's healthcare system." Peake Decl. ¶ 9.[11] To ensure safe reopening, Governor Northam has implemented "a phased approach . . . grounded" in federal guidelines, with the first phase beginning when the evidence shows, among other things, downward trends in the percentage of positive tests and the number hospitalizations and ICU admissions over a two-week period.[12] Although some regions in Virginia have met the benchmarks to begin the first phase of reopening, others have not, including all of Northern Virginia.[13]

4.      The election at issue in this litigation—which was originally scheduled for June 9—involves several primaries for the United States House of Representatives, a Democratic

---

[10] See Va. Dep't of Health, *COVID-19 Data Insights*, https://www.vdh.virginia.gov/coronavirus/covid-19-data-insights/ (last visited May 20, 2020).

[11] See generally Univ. of Va., Biocomplexity Inst., *Estimation of COVID-19 Impact in Virginia* (April 13, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/ governor-of-virginia/pdf/Combined-PPT-April-13.pdf.

[12] Office of the Governor of Virginia, *Governor Northam Unveils Blueprint for Easing Public Health Restriction*, (Apr. 24, 2020), https://www.governor.virginia.gov/ newsroom/all-releases/2020/april/headline-856337-en.html.

[13] Northern Virginia officials expressed concern that beginning reopening would jeopardize that region's efforts to contain COVID-19. The Governor and the Commissioner of Health on May 12 granted the request to delay easing restrictions in that region. Executive Order 62 and Order of Public Health Emergency Four (EO 62), Va. Exec. Order No. 2020-62 (Amended), 1–2 (noting that the Northern Virginia region has a "substantially higher . . . percentage of positive tests," far higher numbers of confirmed cases, and continued difficulties securing sufficient personal protective equipment). EO 62 was amended to include the City of Richmond and Accomack County. In Richmond, the "percent positivity of COVID-19 cases has failed to decrease over the past two weeks" and "its total case count grew." *Id.* at 2. "Although Accomack's population is .39% of the Commonwealth, its positive cases represent 2.14% of the statewide totals" and "the number of COVID-19 cases in the County of Accomack continues to increase." *Id.*

primary in a local election, and a Republican primary for the United States Senate.[14] After the federal and state governments declared states of emergency in response to COVID-19, Governor Northam issued an executive order moving the election to June 23.[15] That same order instructed the Department of Elections to "prescribe appropriate procedures" to implement the provisions of the executive order and to enact "procedures in accordance with the Centers for Disease Control and Prevention and Virginia Department of Health to assist in ensuring the safety and well-being of election officials, officers of election, and voters."[16] These measures reflect guidance from the Centers for Disease Control and Prevention (CDC), which recommends that election officials "[e]ncourage mail-in methods of voting."[17]

5.      The specific guidance that plaintiffs challenge—permitting voters concerned about contracting COVID-19 to select reason "2A My disability or illness" to obtain an absentee ballot (the COVID-19 Guidance)—represents a critical part of the Commonwealth's efforts to protect people from COVID-19.

Current Virginia law permits certain voters to vote by absentee ballot. These voters include people "unable to go in person to the polls on the day of election because of his

---

[14] Virginia Dep't of Elections, Certified Candidates in Ballot Order for June 23, 2020 Primary Elections, https://www.elections.virginia.gov/media/castyourballot/candidatelist/June-2020-Primary-Candidates-List-5.6.pdf.

[15] Va. Exec. Order No. 2020-56 (Amended) (April 24, 2020) (Executive Order 56), https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-56-AMENDED---Postponing-June-9,-2020-Primary-Election-to-June-23,-2020-Due-to-Novel-Coronavirus-(COVID-19).pdf; see also Va. Code Ann. § 24.2-603.1 (permitting postponement of elections during states of emergency).

[16] Executive Order 56 ¶ 6.

[17] Centers for Disease Control and Prevention, *Recommendations for Election Polling Locations*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last visited May 20, 2020).

disability, illness, or pregnancy." Va. Code Ann. § 24.2-700(4).[18]

On March 16, defendant Christopher Piper, the Commissioner of the Virginia

Department of Elections (ELECT), emailed general registrars "recommend[ing] that localities"

with upcoming elections "encourage voters to apply online for an absentee ballot . . ." Piper

Decl. ¶ 17. Since March 17, the top of ELECT's absentee voting page has stated (the COVID-19

Guidance):

> The Virginia Department of Elections encourages voters to protect their health during
> COVID-19 outbreak. Voting absentee in the coming May and June elections is strongly
> encouraged. Voters may choose reason "2A My disability or illness" for absentee voting
> in the May and June 2020 elections due to COVID-19. Voters who choose the absentee
> option should do so as soon as possible so they can get their ballots in time to return them
> by mail by Election Day.[19]

The Department of Elections' social media pages have also reflected this guidance. Piper Decl.

¶ 18. These actions sought to: (1) prevent further spread of the disease, and protect the health and

welfare of voters, poll workers, and election officials; (2) promote voter participation to allow all

qualified voters the opportunity to cast a ballot; and (3) maintain the uniformity, accessibility,

and security of the electoral process.[20]

---

[18] Beginning July 1, 2020, all Virginia voters will be eligible to vote absentee. See Virginia's
Legislative Information System, HB1, https://lis.virginia.gov/cgi-
bin/legp604.exe?201+sum+HB1.

[19] https://www.elections.virginia.gov/casting-a-ballot/absentee-voting/.

[20] Numerous states have taken similar measures to protect people from contracting COVID-
19 at the polls. Alabama's Secretary of State, for example, issued guidance clarifying that the
state's stringent absentee voting requirements can be conformed to the need of voters to remain
at home during the coronavirus pandemic; those concerned about contracting or spreading the
virus may indicate that they can't come to the polls due to "physical illness or infirmity." See
*Secretary of State Shares Guidance on Absentee Voting in Upcoming July 14 Primary Runoff
Election*, https://www.sos.alabama.gov/newsroom/secretary-state-shares-guidance-absentee-
voting-upcoming-july-14-primary-runoff-election (Mar. 23, 2020). Arkansas suspended absentee
voting rules—requiring that absentee voters be unavoidably absent from their polling place, or
unable to vote in person due to illness or physical disability—for Arkansas' March 31, 2020
primary election. See Proclamation by Arkansas Governor, EO 20-08,
https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-08._.pdf (Mar. 20, 2020).

5.    As required by statute, ballots have been available to qualified absentee voters since Saturday, May 9, 2020.[21] See Va. Code Ann. § 24.2-603.1; see also Va. Code Ann. § 24.2-612. As of May 18, 2020, 66,113 absentee ballots have been sent to absentee voters, Piper Decl. ¶ 14, and voters have until June 16, 2020 to request an absentee ballot. Va. Code Ann. § 24.2-701(B)(2); Va. Exec. Order no. 2020-56 (Amended).

6.    Plaintiffs filed this action on Wednesday, May 13, 2020—two months after voters were first informed they could vote absentee using reason code 2A in light of COVID-19.[22] Plaintiffs are six registered voters, four of whom intend to vote in person and two of whom intend to vote absentee. Compl. pp. 2–4. Plaintiffs allege four causes of action: (1) direct disenfranchisement (arising under 42 U.S.C. § 1983); (2) vote-dilution disenfranchisement (arising under 42 U.S.C. § 1983); (3) violation of Article I, Section 4 of the U.S. Constitution (the Times, Place and Manner Clause); and (4) violation of the due process clause. Plaintiffs seek

---

Delaware expanded access to absentee voting for its June 2, 2020 primary election and any other upcoming primary or special elections by broadening definition of "sick or physically disabled" to include voters who choose to vote absentee to prevent exposure to and the community spread of coronavirus. See Sixth Modification of the Declaration of a State of Emergency for the State of Delaware, https://governor.delaware.gov/wp-content/uploads/sites/24/2020/03/Sixth-Modification-to-State-of-Emergency-03242020.pdf (Mar. 24, 2020). In light of COVID-19, New Hampshire issued guidance that "all voters have a reasonable ground to conclude that a 'physical disability' exists within the meaning of" New Hampshire absentee voting law. See State of New Hampshire, Memorandum, https://www.doj.nh.gov/documents/20200410-absentee-voting-covid19.pdf#page=4?link_id=44&can_id=3ce03c3d77033bbeb4c4bf7ba04c984c&source=email-voting-rights-roundup-court-blocks-new-hampshire-gops-law-targeting-young-voters-access-to-voting&email_referrer=email_773800&email_subject=voting-rights-roundup-court-blocks-new-hampshire-gops-law-targeting-young-voters-access-to-voting (Apr. 10, 2020).

[21] In situations in which localities' general registrars' offices were not open on May 9, absentee ballots were made available on May 8.

[22] Another group of plaintiffs—represented by the same counsel here—sought to bring this claim in an existing case. See League of Women Voters v. SBE, No. 6:20-cv-00024, ECF No. 22 (W.D. Va. Apr. 23, 2020). Their motion to intervene was denied on April 30, 2020. Id. ECF No. 59.

declaratory relief, injunctive relief, and fees and costs. As to the injunctive relief, plaintiffs ask this Court to:

    a.  Prohibit Virginia's election officials from "allowing persons without disability or illness to vote absentee;"

    b.  Order Virginia's election officials to "issue guidance instructing Virginia voters that they may only vote absentee if they qualify under the statutory categories and definitions;"

    c.  Order Virginia's election officials, "in coordination with city and county election officials, to conduct a public information campaign informing Virginia voters that they may only check 'disability or illness' if they are disabled, ill, or pregnant, as statutorily defined;" and

    d.  Order Virginia's election officials, "in coordination with city and county election officials, to contact any Virginia voters who claimed a disability or illness (1) for the first time and (2) whose absentee application was submitted after Defendants issued guidance . . . to (i) inquire whether the voter marked the box according to [guidance that voters can select reason code 2A in light of COVID-19], and (ii) if so, inform the voter may only vote absentee if they qualify under the statutory categories and definitions."

Compl. ¶ 92.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Rather, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation omitted). In all cases, the party seeking injunctive relief (here,

plaintiffs) "must establish [1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in their favor, and [4] that an injunction is in the public interest." *Id.* at 20.

**ARGUMENT**

Plaintiffs' motion for a preliminary injunction fails for three independent reasons: plaintiffs lack standing, they are wrong about Virginia's absentee voting law, and they fall far short of establishing entitlement to equitable relief. Because a correct understanding of how Virginia's absentee voting law actually works is helpful to understand why plaintiffs lack standing to challenge it, we begin there (see Part I, *infra*) before turning to standing (see Part II, *infra*) and the four-part test for obtaining a preliminary injunction (see Part III, *infra*).

**I.      Plaintiffs' arguments are based on a fundamental misunderstanding of Virginia's absentee voting laws**

Plaintiffs' legal theories rest primarily on their insistence that the COVID-19 Guidance is contrary to Virginia law. Plaintiffs misread Virginia's current absentee voting provision, Virginia Code Annotated § 24.2-700(4). See Part I(B), *infra*. Even more importantly, however, plaintiffs' contention that allowing qualified voters to vote absentee using reason code 2A during the current primary fails because of a different Code provision (Va. Code. § 24.2-603.1) that is directly applicable to elections (like this one) held during emergencies.

**A.      Virginia law permits voting by absentee ballots during a state of emergency**

Virginia law specifically provides that when (as here) an election is postponed because of an emergency "*[a]ny person* who was duly registered to vote as of the original date of [a postponed] election, and who has not voted . . . *may vote by absentee ballot* in accordance with the provisions of Chapter 7 in the rescheduled election." Va. Code Ann. § 24.2-603.1 (emphasis added). The current election was originally scheduled for June 9 and was postponed under this

9

Code provision after both the Governor and the President declared states of emergency. Compl. ¶ 27; Va. Exec. Order No. 2020-56 (Amended). Section 24.2-603.1 thus makes clear that the legislature intended for qualified voters impacted by the emergency to be able to cast their ballot during a postponed election without endangering their safety, the safety of poll workers, and the safety of other voters. Given the parties' shared concern in ensuring adherence to the legislature's judgment, that provision should be the end of the matter.

## B. The COVID-19 Guidance is not contrary to Virginia's otherwise-applicable absentee voting laws

The COVID-19 Guidance is also consistent with the absentee voting rules that apply outside the context of a postponed election. Under Virginia Code Annotated § 24.2-700, any registered voter who satisfies one of twelve criteria may vote absentee. One of those criteria (commonly referred to as Code 2A) is for any voter "with a disability, as defined in § 24.2-101, who is unable to go in person to the polls on the day of election because of his disability, illness, or pregnancy[.]" Va. Code § 24.2-700(4).[23]

1.     Plaintiffs repeatedly insist that the challenged guidance would permit any voter to vote absentee under Code 2A "even if they do not currently have a disability or illness" and that the guidance thus "encourages voters to make a false statement." Compl. ¶¶ 21, 85; see Br. 5, 26. That argument is inconsistent both with the nature of COVID-19 and the intent of the legislature.

To begin, the evidence shows that people may be ill with COVID-19 and not know it, either because they are asymptomatic or because they have not been tested. Oliver Decl. ¶¶ 6–7,

---

[23] Under the Virginians with Disabilities Act, the Act referenced in Va. Code § 24.2-700(4), the term "[p]erson with a disability" means "any person who has a physical or mental impairment that substantially limits one or more of his major life activities or who has a record of such impairment." Va. Code § 51.5-40.1. "Physical impairment" is defined as "any physical condition, anatomic loss, or cosmetic disfigurement that is caused by bodily injury, birth defect, or illness." *Id.*

25. Indeed, in adapting its own operations to protect against the harms posed by COVID-19, this Court noted the "concerns regarding . . . the extent of asymptomatic transmission." General Order No. 2020-12 at 1. Those facts—especially when paired with the reality that tests are not available to everyone—means that any person selecting Code 2A may be infected. See *id.* at 3 n.4 ("Testing limitations prevent some individuals exhibiting symptoms consistent with COVID-19 from learning whether they are infected, and thus contagious"). Accordingly, plaintiffs err in simply asserting that those who follow the COVID-19 Guidance are making a false statement or that the COVID-19 Guidance instructs people to vote absentee even if they somehow know—for certain—that they are not infected.[24]

Plaintiffs' argument also disregards the legislature's interest in ensuring that currently infected people do not infect others at the polls. The current pandemic makes this concern even more important, because people with certain pre-existing conditions (including conditions that, in normal circumstances, might not qualify as a "disability") are at even greater risk of death, serious illness, or even lifelong disability if they contract coronavirus. For example, the CDC identifies numerous factors that render people at "higher risk for severe illness" from COVID-19, including common conditions such as obesity and diabetes and even taking medications that could weaken the immune system.[25] The CDC estimates a 4–11% mortality rate for adults

---

[24] To the extent plaintiffs allege violations of state law, it is black-letter law that federal courts may not grant injunctive relief "against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). Otherwise, a federal court would be in the position of "instruct[ing] state officials on how to conform their conduct to state law"—a function not permitted under the Eleventh Amendment. *Id.* at 106; accord *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 228 (4th Cir. 1997) ("[A] claim seeking injunctive relief for a state official's violation of state law . . . is barred by the Eleventh Amendment.").

[25] Coronavirus Disease 2019 (COVID-19), *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 20, 2020).

between the ages of 65 and 84 and a 10–27% mortality rate for adults 85 years old or older.[26] Indeed, plaintiffs are opaque about whether—under their theory—even a *confirmed* COVID-19 diagnosis would constitute a justification for voting absentee, suggesting that only those with "more than a mild case," Br. 26, should be excused from the requirement of going to the polls to vote. But plaintiffs ignore the fact that the allowances for absentee voting under § 24.2-700(4) is not *only* designed to protect the health of the voter—it also reflects the compelling interest in protecting the health and safety of poll workers, other voters, and the public in general.

Plaintiffs' arguments are also inconsistent with the legislature's efforts to avoid unnecessary intrusion into individuals' personal health information before allowing them to vote. The relevant provision of state law could have—but does not—define the term "illness," nor does not it require those applying for an absentee ballot to provide any secondary information to prove an illness, pregnancy, or disability. See Va. Code Ann. § 24.2-701(C)(6). Just as voters are not required to bring a pregnancy test or submit pictures of an ultrasound to vote absentee by reason of pregnancy, nor are they required to provide medical evidence that they have been infected with COVID-19 before being permitted to vote absentee. Instead, as in many other voting situations, the Commonwealth entrusts its voters with abiding by the law, maintaining the integrity of elections, and respecting their fellow citizens.[27]

---

[26] *Id.*

[27] Plaintiffs also ignore that heightened susceptibility to COVID-19 is, itself, a "physical condition" caused by an "illness" that "substantially limits major life activities." Va. Code Ann. § 51.5-40.1. This high potential for infection, Oliver Decl. ¶ 6–7 (noting possibility of asymptomatic transmission), as well as the stay at home order, which are necessary to prevent further spread of infection, will "substantially limit[] one or more of [individuals'] major life activities." It is clear that many conditions that may have not limited major life activities before the COVID-19 pandemic now do (schools are closed, people are under stay at home or safe at home orders, and even businesses that are open must follow enhanced sanitizing practices). While vulnerable populations with weakened immune systems or underlying health conditions (that in typical times would not be a "disability") may normally have been able to go about their

2.       Plaintiffs also err in their continuous assertions that "the *legislature* found its own limit on absentee ballots to be *necessary* in *this* election." Br. 15; *id.* at 12, 17–18, 21. To begin, any suggestion that the legislature had a global pandemic in mind when it amended Virginia's absentee voting laws is misplaced. HB1, the bill that will—after July 1—permit all registered voters to vote by absentee ballot in *any* election in which they are qualified to vote, was prefiled on November 18 of last year. That bill passed the Senate on February 24, 2020 and the House of Delegates on February 26, 2020—weeks *before* the current state of emergency was declared.[28] To presume that the General Assembly could have predicted that a global pandemic would make in person voting unsafe for the June 23 primary elections is to presume that the legislature can predict all potential future events: it is simply not reasonable.

Plaintiffs' argument also ignores the law that already existed. As previously explained (see Part I(A)(1), *supra*), Virginia's legislature has specifically recognized the need to provide access to absentee voting during an emergency. Va. Code Ann. § 24.2-603.1. In addition, the legislature also granted the Executive Branch authority to act during emergencies for the purpose of "protect[ing] the public peace, health, and safety, and . . . preserv[ing] the lives and property and economic well-being of the people of the Commonwealth," especially during a "[d]isaster," which includes a "communicable disease of public health threat." Va. Code Ann. §§ 44-146.14(a), -146.16; see also § 32.1-2 (declaring that "the protection, improvement and preservation of the public health and of the environment are essential to the general welfare of the citizens of the Commonwealth" and directing the State Board of Health and the State Health

---

lives unimpeded, the COVID-19 pandemic presents an unprecedented set of circumstances that threatens those individuals' lives even in routine interactions.

[28] See Virginia's Legislative Information System, https://lis.virginia.gov/cgi-bin/legp604.exe?201+sum+HB1.

Commissioner, assisted by the State Department of Health, to develop a comprehensive public health program). That assignment of responsibility makes sense because emergencies, including the current pandemic, present unanticipated threats to the lives of the people and necessitate urgent and changeable responses. See generally *People ex rel. Barmore v. Robertson*, 134 N.E. 815, 819 (Ill. 1922) ("Legislatures cannot anticipate all the contagious and infectious diseases that may break out in a community."). Plaintiffs ask this Court to erase the decisions of the officials to whom Virginia's legislature entrusted such judgments and, instead, impose a judicially enacted policy. But "[o]ur constitution does not contemplate that the federal judiciary routinely will pass judgment on particular elections for federal, state or local office" because "federal courts are ill-equipped to monitor the details of elections and resolve factual disputes born of the political process." *Hutchinson v. Miller*, 797 F.2d 1279, 1280, 1286 (4th Cir. 1986).

## II.    Plaintiffs lack standing to seek injunctive relief

It is black-letter law that federal courts may not grant any form of coercive relief—including a preliminary injunction—without assuring themselves that they have Article III jurisdiction. Because here there are, at absolute minimum, serious doubts about whether they have standing, plaintiffs are not entitled to the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24.[29]

1.     "The party invoking [federal] jurisdiction . . .bears the burden of establishing standing," *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009), and must demonstrate its standing for each type of relief sought, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

---

[29] For purposes of the current motion, it is sufficient for this Court to conclude that plaintiffs *may* lack standing (because plaintiffs who cannot establish that they likely possess standing *a fortiori* cannot show a likelihood of success on the merits). If the Court concludes that plaintiffs cannot, as a matter of law, establish standing, it should dismiss the action in its entirety. See Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

To satisfy Article III, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180–81 (2000). A "generalized interest" shared by all citizens in "constitutional governance" is inadequate to establish a specific party's standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576 (1992). And "[w]hen the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether *the plaintiff is himself an object of the action* . . . at issue." *Id.* at 561 (emphasis added).

2. Plaintiffs' lack of standing is evident from the onset. Injury in fact is "the '[f]irst and foremost' of standing's three elements." *Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alteration in original) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). Among other things, "an injury in fact must be both concrete and particularized." *Id.* at 1548. Plaintiffs' brief discusses three potential injuries: direct disenfranchisement, vote dilution, and concern about voters making false statements. None of these three alleged injuries is sufficiently concrete and particularized to confer standing.

***Direct disenfranchisement***. Plaintiffs' direct disenfranchisement interest does not confer standing because plaintiffs' own right to vote is neither eliminated nor directly impacted by whether (and under what circumstances) *other people* are allowed to vote absentee. Nothing about the challenged guidance prohibits plaintiffs Thomas Curtin, Suzanne Spikes, Kelley Pinzon, or Carol Fox from going to the polls to vote or prevents plaintiffs Donna Curtin or Tom Cranmer from voting by absentee ballot.

15

Plaintiffs speculate that "the flood of ballots that will be beyond the abilities of USPS and election workers . . . to adequately handle, resulting in ballots not sent, lost ballots, and tardy ballots, resulting in direct disenfranchisement." Br. 10; see also Compl. ¶ 73.[30] As an initial matter, this alleged "disenfranchisement" has no conceivable application to the four plaintiffs who intend to vote in-person because they do not establish an imminent risk that any "surge in absentee ballots" will cause ballots at polling places to "never arrive or arrive too late" or "get lost." Compl. ¶¶ 5, 7, 8, 10, 73.

As to the two plaintiffs who intend to vote absentee (Donna Curtin and Tom Cranmer), defendants are not preventing them from voting in person and, in any event, neither Curtin nor Cranmer has alleged any problem with receiving a ballot and their raw speculation that their ballots, once mailed back, *might* get lost cannot establish standing. Plaintiffs' reliance on the experience of other states—see Br. 6–8 (relying on anecdotes from Wisconsin, North Carolina, and Texas)—and a declaration from a single election official who left office more than two years ago (well before COVID-19 emerged), fall far short of establishing an "actual and imminent" threat that plaintiffs' ballots will be lost. *Summers*, 555 U.S. at 493 ("a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized" and that "the threat [is] *actual and imminent*, not conjectural or hypothetical") (emphasis added). Finally, even if plaintiffs had adequately supported their suggestions that non-party *mail services* may lose ballots or that non-party *localities* have not set up the proper infrastructure to handle absentee ballots—and plaintiffs have not—any such injuries would not be "fairly traceable to the

---

[30] Plaintiffs' own allegations are contradictory. On the one hand they allege—citing only a single declaration from a former election official—that chaos will ensue. Compl. ¶¶ 5, 7, 8, 10, 73. But, on the other hand, they specifically allege that "there is sufficient time to distribute and handle absentee ballots and applications." Compl. ¶ 22.

challenged action of the defendant" and would be "the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).[31]

      ***Vote dilution***. Plaintiffs' vote dilution theory alleges that "[b]ecause illegal votes dilute legal votes, this violates the rights of Voters and all voters due to vote-dilution disenfranchisement." Compl. ¶ 78. A district court in Nevada recently rejected that same argument when it was made by the same counsel who represent plaintiffs here, and the court's reasoning is directly on point as well. Here, as in that case, because "[p]laintiffs' purported injury"—"having their votes diluted due to ostensible election fraud"—could be "raised by *any* [Virginia] voter," the claimed "injury therefore does not satisfy the requirement that [p]laintiffs must state a concrete and *particularized* injury." *Paher v. Cegavske*, No. 320CV00243MMDWGC, 2020 WL 2089813, at *5 (D. Nev. Apr. 30, 2020) (emphasis added); accord *American Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").[32]

      Plaintiffs' vote-dilution injury fails for another reason as well: it is premised on the entirely unsupported (and unfounded) assumption that permitting more Virginia voters to vote by absentee ballot will result in voter fraud. Relying on stray examples that are almost entirely from

---

[31] The declarations defendants submitted (including from the *current* Director of Elections of Fairfax County) demonstrate that, despite the additional demands, local elections officials are prepared to process and count the expected number of absentee ballots.

[32] Plaintiffs' "three levels of specificity," Br. 24 (asserting "Plaintiffs' claim here is actually three levels of specificity below generalized 'citizens'" because their claims pertain to (1) registered voters; (2) eligible voters; and (3) voters who actually vote) would encompass millions of people. For example, 2,383,646 voters voted in Virginia's November 2019 election. Virginia Department of Elections, *Registration/Turnout Reports*, https://www.elections.virginia.gov/resultsreports/registrationturnout-statistics/.

other states,[33] plaintiffs summarily assert that the COVID-19 Guidance risks "absent-ballot

fraud." Br. 11, 12, 17, 21, 22. But that is an empirical assertion, and plaintiffs fail to provide any

substantial evidence in support for it. In addition, Virginia law sets forth robust protections to

prevent fraud in absentee voting, including:

- Absentee ballot applicants must provide identifying information, including their name,

  address, and, if the voter is applying for an absentee ballot via mail, the last four digits of

  their social security number. Va. Code Ann. § 24.2-701(C).

- Applicants must swear to the truth of the provided information, subject to felony

  penalties for making false statements. § 24.2-701(A).

- All general registrars maintain a publicly available absentee voter list with the name and

  address of each registered absentee voter and a separate file of the applications of the

  listed applicants. § 24.2-706.

- For each absentee ballot application, the general registrar confirms that the applicant is a

  registered voter. § 24.2-706.

---

[33] The fact that plaintiffs could only reference a single instance of voter fraud in the last four years itself highlights that they have not shown rampant voter fraud in Virginia. See generally Brennan Center for Justice, *The Myth of Voter Fraud*, https://www.brennancenter.org/issues/ensure-every-american-can-vote/vote-suppression/myth-voter-fraud ("[E]xtensive research reveals that fraud is very rare, voter impersonation is virtually nonexistent, and many instances of alleged fraud are, in fact, mistakes by voters or administrators. The same is true for mail ballots, which are secure and essential to holding a safe election amid the coronavirus pandemic."). Plaintiffs' stray examples from Virginia (Br. 6–8) have nothing to do with providing a reason to obtain an absentee ballot and establish nothing about the risk of fraud in absentee voting in the coming election. For example, plaintiffs make vague reference to "mail ballot fraud charges" from 60, 50, and 40-years-ago but the source plaintiffs cite provides no additional detail. And plaintiffs' discussion of a conspiracy to "buy[] votes, steal[] absentee ballots, and forg[e] ballots" 16 years ago, alleged voter applications under dead people's names from 2016, and a single instance from 2018 of a man attempting to cast a ballot in his dead wife's name, say nothing about increase of fraud resulting from using reason code 2A.

- Unless otherwise permitted to obtain assistance for reason of blindness, disability, or inability to read or write under Va. Code Ann. § 24.2-704, only the actual voter may complete a ballot, and voters using absentee ballots must include a signed attestation confirming identity, eligibility, and absence of double-voting. § 24.2-706.

- Upon receipt of the absentee ballot, the general registrar or electoral board checks the ballot against the absentee voter applicant list and marks the date of receipt in the appropriate column opposite the name and address of the voter. § 24.2-710.

- Voter malfeasance triggers harsh criminal penalties. See Va. Code Ann. § 24.2-1004(B) ("Any person who intentionally (i) votes more than once in the same election . . . is guilty of *a Class 6 felony*.") (emphasis added); § 24.2-1016 ("Any willfully false material statement or entry made by any person in any statement, form, or report required by this title shall constitute the crime of election fraud and be punishable as *a Class 5 felony*.") (emphasis added); § 24.2-1012 ("Any person who knowingly aids or abets or attempts to aid or abet a violation of the absentee voting procedures . . . shall be guilty of *a Class 5 felony*" and "[a]ny person attempting to vote by fraudulently signing the name of a qualified voter shall be guilty of forgery and shall be guilty of *a Class 4 felony*.") (emphases added).

In short, plaintiffs fall far short of establishing that there is an "actual and imminent" threat that their votes will be diluted by fraud. *Summers*, 555 U.S. at 493. Plaintiffs also fail to show any "causal connection" between the alleged injury of vote dilution and the purported unlawful conduct they allege defendants have engaged in. See *Lujan*, 504 U.S. at 560.

***General interest in having the law followed***. Plaintiffs' general interest in having the law followed likewise cannot confer standing. As previously explained, plaintiffs' assertion that, by

issuing their COVID-19 Guidance, Virginia's elections officials violated Virginia law and "encourage[] voters to make a false statement," Compl. ¶ 21, lacks merit. In any event, plaintiffs also lack standing to raise these arguments.

Plaintiffs' own allegations make clear that they do not intend to follow the COVID-19 Guidance. The two plaintiffs who intend to vote absentee (Donna Curtin and Tom Cranmer) specifically allege that they "qualif[y] to vote absentee," Compl. ¶¶ 6, 9, and the other four plaintiffs specifically allege that they intend to vote in person. Compl. ¶¶ 5, 7, 8, 10. And to the extent plaintiffs assert that the COVID-19 Guidance encourages *other people* to risk felony charges associated with voting malfeasance—which it does not—plaintiffs raise nothing more than a general interest in having the law followed, something that the Supreme Court has "consistently held . . . does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74; see *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974) ("To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.'") (internal quotation marks and citations omitted).

## III.    Plaintiffs are not entitled to a preliminary injunction

Even if plaintiffs had standing, they have failed to demonstrate their entitlement to the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24. That is all the more so here for two reasons. *First*, plaintiffs ask this Court to alter the absentee voting rules in the middle of the absentee voting period. But the Supreme Court has cautioned that late-breaking court orders impacting elections risk harming the right to vote because such orders "can themselves result in voter confusion and consequent incentive to remain away from the polls," a

"risk [that] will increase" "[a]s an election draws closer." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). *Second*, the challenged measure involves the Commonwealth's efforts to address an ongoing emergency, which directly impacts the appropriate constitutional analysis. But even applying traditional principles, plaintiffs have not shown a likelihood of success on the merits, the harms they allege are illusory, and the public interest and balance of the equities tip decisively against them.

### A.    Plaintiffs have not established that they are likely to succeed on the merits

1.    Plaintiffs' challenges fail at the outset because they do not acknowledge or engage with the relevant framework. "Dealing with . . . an emergency situation requires an immediacy of action that is not possible for judges," *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971), and "[i]t is no part of the function of a court" to determine which measures are "likely to be the most effective for the protection of the public against disease," *Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905). For that reason, in evaluating the lawfulness of emergency measures, "the scope of [a court's] review" is properly "limited to a determination of whether the [government's] actions were taken in good faith and whether there is some factual basis for [the] decision." *Chalk*, 441 F.2d at 1281.

It is difficult to imagine a more appropriate moment for such deference. Authorities estimate that 1.5 to 2.2 million Americans could have died if governments did nothing to stop the virus,[34] and a battery of evidence supports the conclusion that encouraging people to remain at home is necessary to curb its spread, Oliver Decl. ¶ 21.[35] Virginia's election officials

---

[34] William Wan et al., *Experts and Trump's Advisers Doubt White House's 240,000 Coronavirus Deaths Estimate*, Wash. Post (Apr. 2, 2020), https://tinyurl.com/vymlmsy.

[35] See also Coronavirus Disease 2019 (COVID-19), *What You Can Do*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html (last visited May 20, 2020).

21

indisputably acted in good faith in issuing the COVID-19 Guidance. Accordingly, their chosen strategy for slowing the spread of COVID-19 and saving lives warrants deference.

2.      Especially with this deference in mind, plaintiffs have failed to establish likelihood of success on the merits.

***Direct disenfranchisement***. "When a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). This inquiry's rigorousness depends on the severity of the constitutional burden posed by the challenged regulation. *Marcellus v. Virginia State Bd. of Elections*, 849 F.3d 169, 175 (4th Cir. 2017).[36]

Plaintiffs' failure to establish a direct disenfranchisement injury to confer standing, see Part II *supra*, is also fatal to their direct disenfranchisement cause of action: plaintiffs have not shown a restriction on their right to vote. In any event, even accepting plaintiffs' argument that some absentee ballots may be lost—and, for the reasons discussed above, plaintiffs have made no such showing—the public interests at play here are easily "sufficient" to justify any restriction.[37] The Supreme Court has emphasized that "[p]rotection of the health and safety of

---

[36] Plaintiffs cite no authority for the claim that because a new law permitting voters to vote absentee without providing a reason takes effect on July 1—the date upon which nearly all legislation in Virginia takes effect, Va. Const. art. IV, § 13; Va. Code Ann. § 1-214(A)—that fact "establishes the disenfranchisement harm as a matter of law." Br. 15.

[37] Without citing any authority, plaintiffs assert that "[g]iven that direct disenfranchisement is a severe burden," defendants "must prove the [COVID-19 guidelines are] narrowly tailored to a compelling state interest." Br. 18. But simply asserting direct disenfranchisement does not entitle plaintiffs to strict scrutiny. The COVID-19 Guidelines would, nevertheless, survive strict scrutiny. "[P]revent[ing] the spread of" a highly contagious "communicable disease[] clearly constitutes a compelling interest." *Workman v. Mingo Cty. Bd. of Educ.*, 419 Fed. Appx. 348,

the public is a paramount governmental interest which justifies summary administrative action." *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981); *Workman v. Mingo Cty. Bd. of Educ.*, 419 Fed. Appx. 348, 353 (4th Cir. 2011) ("prevent[ing] the spread of" a highly contagious "communicable disease[] clearly constitutes a compelling interest"). This is especially true during a global pandemic.[38]

The fact that granting plaintiffs the relief they seek will actually *result* in voter disenfranchisement also favors defendants. As other courts have recognized, "voters worried about risks to their health or unsure about how to obtain an absentee ballot may very well be discouraged from exercising the right to vote all together," *Paher*, 2020 WL 2089813, at *7, and the Constitution does not require the Commonwealth to "force a large class of Virginians to face the choice between adhering to guidance that is meant to protect not only their own health, but the health of those around them, and undertaking their fundamental right—and indeed, their civil duty—to vote in an election," *League of Women Voters v. SBE*, No. 6:20-cv-00024, ECF No. 69, at 16 (W.D. Va. May 5, 2020). Plaintiffs also disregard the disenfranchisement that can result from changing the absentee voting requirements in the middle of the absentee voting period. See *Purcell*, 549 U.S. at 4–5.[39]

---

353 (4th Cir. 2011). Because the nature of COVID-19 is such that any person may be infected (and can thus infect others), the COVID-19 Guidelines are tailored as narrowly as possible.

[38] Plaintiffs' discussion of *United States v. Salerno*, 481 U.S. 739 (1987), see Br. 18, flips the analysis on its head. Plaintiffs—not defendants—bring the constitutional challenge here. And, as explained in Section I *supra*, the COVID-19 Guidelines are perfectly consistent with Virginia law.

[39] Plaintiffs' assertion (at 14 n.27) that defendants "d[id] a *Purcell* principle violation" here, ignores the timeline of events it issue. Commissioner Piper announced the COVID-19 Guidelines on March 16, seven and a half weeks before the absentee voting period began (on May 8 in some jurisdictions and on May 9 in others). By contrast, plaintiffs waited until *after* the absentee voting period had already begun to commence this suit, and they ask this Court to change the rules in the middle of the absentee voting period.

*Vote dilution*. Plaintiffs' vote dilution claim is premised on unsubstantiated speculation about voter fraud, and on the unfounded assumption that Virginia's numerous protections against fraud will fail. See Section II(ii) *supra*.[40] Even if it were appropriate to move to the *Anderson-Burdick* balancing analysis—and it is not because plaintiffs' vote dilution claim fails at the onset—the balancing weighs heavily in favor of defendants for the same reasons as it does in connection with plaintiffs' direct disenfranchisement claim.

*Time, Place, and Manner Clause (Article I, § 4)*.[41] Plaintiffs set forth no legal argument in support of their claim that the COVID-19 Guidance violates Article I, § 4 of the United States Constitution. See Br. 25 (asserting that this "issue need not be reached" and not reaching it). That alone means plaintiffs have not established likelihood of success on the merits of this claim. The claim also fails for the additional reason that it is premised on plaintiffs' flawed statutory assertion that the COVID-19 Guidance violates § 24.2-700(4). See Section I *supra*.

*Due process claim*. Plaintiffs' due process claim is predicated on their argument that the COVID-19 Guidelines are contrary to Virginia law. See Br. 26. Because the COVID-19 Guidelines are perfectly consistent with Virginia law, see Part I *supra*, plaintiffs have not shown a likelihood of success on the merits of their due process claim.

---

[40] Courts' recognition of a vote dilution theory arises under the Voting Rights Act of 1965; it is not based on a claim individual votes could conceivably be offset by speculative voter fraud. See *Thornburg v. Gingles*, 478 U.S. 30 (1986) (plaintiffs alleged that a plan that submerged black voters into a district with a white majority diluted the black votes, impairing their ability to elect representatives of their choice); see also *McGhee v. Granville Cty., N.C.*, 860 F.2d 110, 116 (4th Cir. 1988) ("'Vote dilution' . . . is but one of various ways in which the voting rights of racial minorities may be 'denied or abridged' in violation of § 2" of the Voting Rights Act).

[41] This provision of the Constitution states, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1.

**B.**   **Plaintiffs have not shown that they are likely to suffer irreparable harm in the absence of preliminary relief**

The Supreme Court has specifically rejected the argument that a preliminary injunction may be entered based "only on a *possibility* of irreparable harm." *Winter*, 555 U.S. at 21 (internal quotation marks omitted; emphasis added). Instead, plaintiffs—like all parties seeking such relief—must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22. And because all of the harms plaintiffs allege here are unsubstantiated and speculative, see Part II *supra*, plaintiffs have not shown they are *likely* to suffer irreparable harm.

**C.**   **The balance of equities and public interest factors independently foreclose a grant of preliminary equitable relief**

As the Supreme Court has emphasized, the third and fourth preliminary injunction factors tend to "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And here, any harm plaintiffs may experience if this Court *denies* a temporary injunction must be balanced against the catastrophic and permanent harm that others could suffer if the Court *grants* one. See *Winter*, 555 U.S. at 24 ("courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction" (quotation marks and citation omitted)).

1.   The benefits of the COVID-19 Guidelines are far reaching. They include: (i) protecting sick voters from infecting others at the polls; (ii) protecting healthy voters from contracting COVID-19 at the polls; (iii) protecting poll workers and elections officials from contracting COVID-19 or spreading the disease; and (iv) ensuring a uniform and orderly election.

2.   Plaintiffs' attempts to minimize the ongoing threat fall flat. Plaintiffs do not even acknowledge that COVID-19 has already infected five *million* people and killed more than *three*

*hundred thousand* worldwide. See Oliver Decl. ¶ 9. Instead, plaintiffs insist—while citing no authority—that "old models predicting a high death rate and large numbers of casualties have proved inaccurate." Br. 2.[42]

Plaintiffs misconstrue the models. Many models predicted what would happen *without* emergency measures—such as the measure plaintiffs challenge here—that help prevent the spread of the virus. The fact that the worst case projections did not become a reality does not reflect that the models were wrong, it reflects that the measures taken to curb the spread of the disease are working. Oliver Decl. ¶ 29; Peake Decl. ¶ 8. Plaintiffs also summarily assert that "harms and risks associated with COVID-19 are receding" and "any burden thought once to be posed by COVID-19 is downgraded." Br. 16. They compare contracting COVID-19 with "the inconvenience of going to the Bureau of Motor Vehicles." Br. 16 (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008)).[43] Plaintiffs fundamentally misunderstand the situation.

3.      The fact that some parts of the Commonwealth have entered Phase One does not mean the threat has receded or that the virus no longer poses a risk. See Oliver Decl. ¶ 29. ("Virginia still faces a significant public health emergency, and COVID-19 continues to spread in our communities."); see also United States District Court for the Eastern District of Virginia, General Order No. 2020-12, at 2 ("The statewide response in Virginia acknowledges the reality

---

[42] See also Br. 16 ("Defendants' Plan is based on speculation of great risk based on models since shown to be flawed."); Br. 19–20 ("self-disenfranchisement due to COVID-19 is built on speculation likely based on early, badly flawed models of COVID-19 with an erroneously high fatality rate and exorbitant numbers of predicted death. But those models proved wrong."); Br. 21 ("COVID-19 models now proven erroneous and . . . most people will be just fine").

[43] Plaintiffs' argument that "'even assuming that the burden may not be justified as to a few voters, that conclusion is by no means sufficient to establish' the facial relief sought," Br. 16–17 (quoting *Crawford*, 553 U.S. at 198), again confuses the posture of this case. Plaintiffs, not defendants, are seeking relief from the Court.

that conditions will remain dangerous even after the future 'peak' of COVID-19 cases in

Virginia."). The fact that many cases of COVID-19 continue to go undetected, that there are not

enough tests to test everyone, and that the tests are not perfectly accurate, all mean that even

well-meaning people will continue to spread the disease. *Id.* at 3 ("The available evidence

suggests that all government and private entities seeking to track the spread of COVID-19 face

difficultly quantifying the scope of the spread because many COVID-19 cases go undetected due

to varying degrees of symptoms suffered by infected individuals and because there is a limited

supply of available COVID-19 tests and/or lab capacity to process such tests"); Oliver Decl.

¶¶ 6–7, 25; Peake Decl. ¶ 5.[44]

    4.    Plaintiffs' own sources undercut their assertions that voting in person is entirely

safe. For example, plaintiffs assert that "[t]here has been no established causal link between in-

person voting and the contracting of COVID-19." Compl. ¶ 33; Br. 4–5. But the same source

plaintiffs cite for that assertion warns that "having thousands of people go to vote in person [in

Wisconsin] even as the state and federal governments were telling people to stay at home was a

bad decision" and "greatly increased the risk of spreading the illness."[45] It also quotes a former

CDC official who explained that "[w]hether or not we saw an increase in cases and deaths

following is not the question . . . The question is did we increase the risk of transmission and the

---

[44] See also *League of Women Voters*, No. 6:20-cv-00024, ECF No. 69, at 16–17 (Finding that
although employing practices used by people like "wearing masks" and other "common sense"
steps can mitigate some COVID-19 risks, "for many . . . such measures come up far short.
Indeed, evidence in the record reflects that the virus can be transmitted with 'ease' . . . and
further, individuals who are infected with the virus can transmit the virus before they develop
any symptoms.").

[45] Daphne Chen and John Diedrich, *Two weeks after election, COVID-19 cases have not
spiked in Wisconsin but experts urge caution about conclusions*, Milwaukee Journal Sentinel
(Apr. 22, 2020), https://www.jsonline.com/story/news/2020/04/22/covid-19-hasnt-spiked-after-
wisconsin-election-experts-urge-caution/2997394001/.

answer is absolutely."[46] Plaintiffs' claims are also belied by evidence after the Wisconsin

election of a "a statistically and economically significant association between in-person voting

and the spread of COVID-19 two to three weeks after the [Wisconsin] election" and the finding

that "the consolidation of polling locations, and relatively fewer absentee votes, increased

positive testing rates two to three weeks after the election."[47] The relief plaintiffs seek from this

Court asks the Court to disregard this evidence and the judgment of the government officials

tasked (by Virginia's legislature) with addressing the disease and instead, accept their rosy

picture of the pandemic and their summary assertion that "[e]xpanding absentee balloting is

unnecessary to combat COVID-19." Compl. ¶ 31.

     5.     The relief plaintiffs seek also would cause significant harm. Requiring swarms of

people to appear at in-person voting locations would greatly enhance the risk of spreading

COVID-19, not only to and from the voters themselves but to and from poll workers and election

officials as well. Requiring election officials to contact Virginia voters who claim disability or

illness and ask about why they sought an absentee ballot, see Compl. ¶ 92(D), would involve

significant expenditure of scarce public resources and implicate serious privacy interests of

thousands of Virginians.[48] Changing the rules in the middle of the absentee voting period would

also render the election non-uniform, and thus in violation of Virginia law. See Va. Code Ann.

---

[46] *Id.*

[47] Chad Cotti, et al., *The Relationship between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence from the Wisconsin Primary*, The National Bureau of Economic Research (May 11, 2020), https://www.nber.org/papers/w27187 (study using county level data on voting and COVID-19 tests to connect the election to the spread of the disease).

[48] This proposed probe into absentee voters who sought absentee ballots utilizing the "illness/disability" reason code would unreasonably and disproportionately probe into the applications of people with disabilities in a manner inconsistent with the Americans with Disabilities Act. *National Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016).

§ 24.2-103(A) (charging the State Board of Elections, through the Department of Elections, with "supervis[ing] and coordinat[ing] the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections").

"[A] last-minute decision declaring Virginia's [COVID-19 Guidance] unconstitutional . . . would significantly affect non-parties as well." *Miller v. Brown*, 462 F.3d 312, 320 (4th Cir. 2006). Voters were told more than two months ago about the COVID-19 Guidelines and over 66,000 people have already sought absentee ballots in reliance on these guidelines. Granting plaintiffs' requested injunction would leave qualified voters who have already sought, obtained, or cast absentee ballots unsure of their status and place voters concerned about contracting COVID-19 at the polls in the tenuous position of choosing between their health and their fundamental right (and civil duty) to vote. Voters who currently carry the virus—or suspect they might—would be placed in the similarly tenuous position of choosing between their own fundamental right to vote and the fear that they may infect someone with else a deadly disease. In short, the public interests in protecting the health and safety of Virginia's voters far outweigh plaintiffs' claims based on speculative and inaccurate assertions.

*          *          *

The Fourth Circuit has specifically held that delay in bringing a suit forecloses equitable relief, see *Simkins v. Gressette*, 631 F.2d 287, 296 (4th Cir. 1980),[49] and both it and the Supreme Court have repeatedly cautioned against judicial changes "on the eve of the election [that] would seriously disrupt the election process," *Miller v. Brown*, 462 F.3d 312, 321 (4th Cir. 2006); see

---

[49] *Id.* at 296 (denying equitable relief when plaintiffs "chose to wait for more than three years until the eve of the [] elections" reasoning that "[s]uch a delayed suit, if maintained, would clearly cause a major disruption in the election momentarily to begin in South Carolina").

*Purcell*, 549 U.S. at 4–5. Such admonitions are all the more salient here, where the challenged absentee guidelines were issued more than two months ago but plaintiffs waited until after the absentee voting period was already underway before bringing this case. Because judicial intervention at this point would cause confusion and seriously disrupt an absentee voting period that has already begun, the Court should stay its hand and deny the requested relief.

## CONCLUSION

The motion for a preliminary injunction should be denied.

Respectfully submitted,

By:  */s/ Michelle Kallen*

Mark R. Herring
  *Attorney General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Donald D. Anderson (VSB No. 22114)
Samuel T. Towell (VSB No. 71512)
  *Deputy Attorneys General*

Heather Hays Lockerman (VSB No. 65535)
  *Senior Assistant Attorney General*

Jacqueline C. Hedblom (VSB No. 68234)
Carol L. Lewis (VSB No. 92362)
Erin R. McNeill (VSB No. 78816)
  *Assistant Attorneys General*

Michelle S. Kallen (VSB No. 93286)
  *Deputy Solicitor General*

Toby J. Heytens (VSB No. 90788)
  *Solicitor General*

Martine E. Cicconi (VSB No. 94542)
  *Deputy Solicitor General*

Jessica Merry Samuels (VSB No. 89537)
  *Assistant Solicitor General*

Zachary R. Glubiak (VSB No. 93984)
  *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2020, a true and accurate copy of this paper was filed electronically with the Court's CM/ECF system, which will then send a notification of such filing to the parties.

By:   */s/ Michelle S. Kallen*
　　　Michelle S. Kallen